WILLIAM B. ELMER & others *vs.* BOARD OF ZONING
ADJUSTMENT OF BOSTON.

Suffolk.    May 4, 1961. — June 14, 1961.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & SPIEGEL, JJ.

*Zoning,* Boston board of zoning adjustment. *Boston. Open Meetings
Law. Municipal Corporations,* Open meetings.

Under G. L. c. 39, § 23C, inserted by St. 1960, c. 437, § 5, and effective as
of January 5, 1959, action taken by a city board in August, 1959, was
not invalid although it was voted at an executive session of the board
held without notice contrary to c. 39, § 23A, inserted by St. 1958, c. 626,
§ 4.   [25–27]
The Boston board of zoning adjustment, in exercising its power to make
changes under St. 1924, c. 488, § 20, as appearing in St. 1941, c. 373,
§ 19, may establish districts having new combinations of use and bulk
different from those appearing in the "Key to Districts" printed on the
statutory Boston zoning map.   [27–33]
Action by the Boston board of zoning adjustment in changing from a resi-
dential 80 foot height zone to a residential 155 foot height zone a sub-
stantial portion of a large general area "predominantly devoted to mul-
tiple family dwelling and institutional uses" and "peculiarly suitable
for high rise construction" was not, on the facts, invalid as spot zoning
where, although the area was "remarkably homogeneous" and the por-
tion changed and the rest unchanged were similar, they were not indis-
tinguishable for zoning purposes.   [33–36]
That an ordinance of Boston limited the height of buildings in an area
would not prevent the Boston board of zoning adjustment from changing
the zoning of the area as to height.   [37]

BILL IN EQUITY, filed in the Superior Court on September
23, 1959.

The suit was heard by *Thompson, J.*

*William H. Kerr,* (*Steven T. Ladoulis,* Assistant Corpo-
ration Counsel, with him,) for the defendant.

*John F. Bok & Roger Allen Moore,* for the plaintiffs.

WHITTEMORE, J.   The plaintiffs, being aggrieved by a
decision of the board of zoning adjustment of the city of
Boston, appealed to the Superior Court under St. 1924,
c. 488, § 20, as appearing in St. 1941, c. 373, § 19.

Elmer *v.* Board of Zoning Adjustment of Boston.

This is the appeal of the board from the decree of the judge, on his determination of the facts (*McHugh* v. *Board of Zoning Adjustment of Boston,* 336 Mass. 682, 687), that the decision of the board be annulled.

The decision of the board filed September 9, 1959, pursuant to vote of August 5, 1959, in terms changed two areas in the Back Bay district of Boston from a Residential, 80 foot height, zone to a Residential, 155 foot height, zone: (a) An area on the water side of Beacon Street between Embankment Road and Dartmouth Street about 1,700 feet long and about 200 feet wide, and (b) an area comprising the two sides of Commonwealth Avenue between Arlington Street and a line 100 feet west of Dartmouth Street about 2,000 feet long and 480 feet wide.

1. The vote of the board was not invalid because taken at an executive session following deliberations at executive sessions, of which no notice had been given in compliance with G. L. c. 39, § 23A, inserted by St. 1958, c. 626, § 4.[1]

Statute 1960, c. 437 (entitled "An Act relative to the notice of certain meetings required by law to be open to the public and relative to the remedy in case of non-compliance with the law requiring that such meetings be open to the public"), by § 5 inserted in c. 39 a new section 23C. The amending act by § 7 provided that the new § 23C should take effect as of January 5, 1959. We hold that it did so take effect and the legality of the meeting of August 5, 1959, and earlier meetings, is to be determined thereunder. See *Donnelly* v. *Dover-Sherborn Regional Sch. Dist.* 341 Mass. 497, 500–501.

Section 23C provides, "Upon proof of failure by any officer to carry out any of his responsibilities for public notice of meetings, for holding them open to the public, or

---

[1] ". . . All [board] meetings . . . shall be open to the public and to the press unless such board . . . shall vote to go into executive session. Such executive session may be held only for the purpose of discussing, deliberating or voting on those matters which by general or special statute, or federal grant-in-aid requirements, cannot be made public, and those matters which if made public might adversely affect the public security, the financial interest of the district, city, town or local housing authority, or the reputation of any person."

for maintaining public records thereof, as such responsibilities are prescribed by this chapter and by chapters thirty A, thirty-four, and sixty-six, any justice of the supreme judicial or the superior court . . . shall issue an appropriate order requiring such officer to carry out as to meetings thereafter held all such responsibilities proved not to have been carried out as to any meeting or meetings theretofore held; but action otherwise duly taken at any meeting shall not be invalidated by the failure of any officer to carry out the said responsibilities for public notice of meetings. . . . The remedy created hereby is not exclusive, but shall be in addition to every other available remedy."

Section 23A was also amended by St. 1960, c. 437, § 3, to take effect on its approval on June 2, 1960. The provision of § 23A in effect through September 9, 1959 (St. 1958, c. 626, § 4), read, "Except in an emergency, no meeting of any . . . city . . . board . . . shall be held unless a notice of such meeting has been filed . . . ." Amended § 23A, by contrast, provides, "Except in an emergency, a notice of each board meeting shall be filed . . . ." Section 23C is far from precisely drawn to validate a meeting held in violation of the mandate that "no meeting . . . shall be held." We think, however, the intent so to do is plain. Statute 1958, c. 626, which first enacted the requirement for open meetings was approved October 7, 1958, and under art. 48 of the Amendments to the Constitution of Massachusetts, The Referendum, I, took effect ninety days thereafter on January 5, 1959, which was the effective date of § 23C. The implication is strong that all questions of the invalidity of meetings because of absence of notice were being put at rest.

The statute requires that "action [be] *otherwise duly taken*" (emphasis supplied) and it expressly exempts from invalidation only failure in respect of "public notice of meetings." The plaintiffs contend this means that in any event, for validity, the meeting was required to be open to the public. We think this imprecise statute does not intend

such result. It would be unlikely that any of the public would be in attendance at a meeting of which no notice was given. It would be arbitrary to let the validity of a meeting, held without public notice and unattended by the public, depend upon whether the meeting was declared "open."

Statute 1960, c. 437, establishes that the public policy that specified meetings be open is to be enforced by injunction against officers who disregard the policy, or by other "available remedy." Invalidation of action taken, although it would tend strongly to enforce the policy, would not be primarily a remedial measure. There are enough prospective difficulties in the implementation of such policy, particularly as applied to boards and agencies which, after due public hearing, with opportunity for all concerned to present their arguments and counterarguments, must weigh and determine important legislative, executive, and quasi judicial matters (see *Fandel* v. *Board of Zoning Adjustment of Boston,* 280 Mass. 195, 197–198), without putting otherwise valid action at the risk of subsequent determination that the particular deliberations were required to be held under public scrutiny. The Legislature has not gone so far.

2. The change ordered by the board was of a kind which the statute permits.

Statute 1924, c. 488, was substantially amended by St. 1941, c. 373, approved June 12, 1941.[2] It is necessary, however, to notice its original substance. As enacted, the statute, in § 2, prescribed by name six "Use Districts" and, in § 10, five "Bulk Districts." In each of § 2 and § 10 the respective districts were further specified "as appearing on the zoning map . . . filed . . . in the office of the state secretary." Sections 3 to 9 of the statute limit the uses of land and buildings in the respective use districts and §§ 11 to 16 limit the height, set backs, and bulk of buildings in the respective bulk districts.

Section 20 of St. 1924, c. 488, as enacted provided that

[2] For the statute authorizing a new zoning regulation, see St. 1956, c. 665, as amended by St. 1958, c. 77, accepted May 22, 1958, under St. 1957, c. 408.

Elmer *v.* Board of Zoning Adjustment of Boston.

"the board may, subject to the following conditions, change the boundaries of districts by changing the zoning map, on file at the state secretary's office . . . ."

Each sheet of the zoning map has printed on it a "Key to Districts" as follows:

### KEY TO DISTRICTS

| USE DISTRICTS | BULK DISTRICTS | | | | |
|---|---|---|---|---|---|
| | 35-FT. | 40-FT. | 65-FT. | 80-FT. | 155-FT. |
| SINGLE RESIDENCE | S-35 | | | | |
| GENERAL RESIDENCE | R-35 | R-40 | R-65 | R-80 | |
| LOCAL BUSINESS | | L-40 | L-65 | L-80 | L-155 |
| GENERAL BUSINESS | | | B-65 | B-80 | B-155 |
| INDUSTRIAL | | | I-65 | I-80 | I-155 |
| UNRESTRICTED | | | | U-80 | U-155 |

The words "change the boundaries of districts by changing the zoning map" could be construed to mean only: change the position of the boundaries between the districts shown on the zoning map. The grant of power to create new combinations of use and bulk districts would permit as great an effect on particular districts as could result from the creation of new categories of bulk or use, or other general amendment of the law. This tends to suggest the delegation of only the limited power to move district boundary lines, and not of some aspects of broad amending power. In *Bradley* v. *Board of Zoning Adjustment of Boston,* 255 Mass. 160, 173, this court, as a reason for the holding that a change in a boundary must be for one or more of the seven grounds specified in the act and must be so stated, said, "In earlier sections . . . the Legislature itself established the boundaries of districts with precision . . . . It would not be likely that a grant of power would be made to change that which the Legislature had itself been at such pains to establish, except upon definite terms and by strict compliance with named conditions." Compare, however, *ibid.,* pp. 167, 170, quoted below.

The plaintiffs do not urge so limited a construction; their contention is that the Legislature by the reference to the

map with its "Key to Districts" established the only combinations of use and bulk districts which the board may apply in making changes, and that it has not the power to create a "Residential 155 foot district." The plaintiffs assert an implied statutory intent that all residential areas have some open space around buildings and the further intent that the intensity of use which is possible in 155 foot bulk districts shall not be permitted in residential areas. For reasons stated in the following paragraphs we are unable to agree.

The construction of St. 1924, c. 488, is affected by what the board and the Legislature have done since 1924.

In some forty instances, seventeen of which were prior to June, 1941, the board has established a use-bulk district corresponding with one of the categories shown in the key, but not adjacent to a use-bulk district of the same category. The change which was litigated in *Co-Ray Realty Co. Inc.* v. *Board of Zoning Adjustment of Boston,* 328 Mass. 103, was of this type (an R–35 district was created within an existing R–40 district), and no question was raised of the power of the board to make such a change.

In eighteen instances,[3] seven of which were prior to June, 1941, the board has purported to create new combinations of use and bulk. In two of the seven instances an R–155 district was created; in the other five the new district was L–35. In one of the three instances of the creation of an R–155 district after June, 1941, the board purported to place in such a district the area on the water side of Beacon

---

[3] An inspection of the zoning map in the office of the State Secretary shows the following changes to new combinations: (*Prior to June, 1941*), (sheet 4) January 25, 1928, L–80 and R–80 to R–155; (sheet 6) August 4, 1938, I–155 to R–155; (sheet 7) May 7, 1928, L–40 to L–35; (sheet 8) April 30, 1927, R–35 to L–35; August 14, 1934, R–35 to L–35; (sheet 9) April 18, 1933, R–35 to L–35; (sheet 11) March 31, 1927, I–80 to L–35. (*After June, 1941*), (sheet 1) March 24, 1950, R–35 to M–40 (M refers to Multiple Residence District, created by St. 1941, c. 373, §§ 1 and 5, see below); (sheet 3) February 28, 1956, R–80 to R–155; September 9, 1959, R–80 to R–155 (this case); (sheet 5) March 31, 1950, R–35 to "Mul. Res. Dist. 40 ft. in height" and M–35; May 28, 1957, R–40 to R–155; (sheet 7) May 21, 1951, I–80 to B–40; February 28, 1956, R–35 to L–35; (sheet 8) October 7, 1941, R–35 to L–35; (sheet 9) March 5, 1951, R–35 to M–35; (sheet 10) September 23, 1946, R–35 to M–35; June 9, 1954, I–80 to B–40.

Street from Dartmouth Street to Massachusetts Avenue. In four instances after June, 1941, the board acted under St. 1941, c. 373, to create new multiple residence districts, no such district having been established on the map by the Legislature.

The enactment of St. 1941, c. 373,[4] in the light of the board's action prior thereto is significant. Section 2 of c. 373 amended St. 1924, c. 488, by inserting a new § 2 which included "Multiple Residence districts" in the group of use districts and further specified such districts "as appearing on the zoning map . . . filed . . . in the office of the state secretary . . . as amended from time to time by the board of zoning adjustment as hereinafter provided." Section 5 of the amending act inserted in St. 1924, c. 488, a new section 3A, limiting the uses permitted in Multiple Residence districts. (Section 3A was amended by St. 1946, c. 198, § 1, and St. 1948, c. 165, § 2.) Section 9 of St. 1941, c. 373, changed St. 1924, c. 488, § 10, to make for bulk districts the same reference to the zoning map that is contained in new § 2.

Inasmuch as the General Court did not by any reference in St. 1941, c. 373, establish on the zoning map the boundaries of any multiple residence district, it is plain that the determination of what areas should be placed in such districts was left to the subsequent action of the board under its power to "change the boundaries of districts by changing the zoning map." The only express restriction was that it must apply the standards and criteria of § 20, and proceed in accordance therewith.

The plaintiffs' brief, in a footnote, asserts that the "[m]ultiple residence use districts [were] to be combined with thirty-five foot bulk districts . . . thus adding an eighteenth, or M–35 district, not shown on the 1924 Key to Districts." A basis for this assertion must be noticed. Section 10 of St. 1941, c. 373, substituted a new § 11 in St. 1924, c. 488, with references to a multiple residence dis-

---

[4] Effective May 15, 1943, see St. 1941, c. 373, § 23, and acceptance of the building code (St. 1938, c. 479; St. 1939, c. 217) on May 15, 1943.

trict. No other section defining a bulk district makes such a reference. The relevant language in new § 11 is this: "In a thirty-five foot district:— *Height and Occupancy:* No building or structure shall exceed thirty-five feet or two and one half stories in height and except in a multiple residence district no building or structure used for habitation . . . shall accommodate or make provision for more than two families. . . . *Building area* . . . In a multiple residence district the area of all buildings and accessory buildings shall not exceed twenty-five per cent of the area of the lot including all portions thereof used for streets, alleys, parks or other permanently open spaces. *Open Spaces in Multiple Residence Districts:* In a multiple residence district no building or accessory building shall hereafter be erected or altered to be within twenty feet of any other building nor within twenty feet of any lot or street line. . . ."

It may be asked, why, if the Legislature contemplated, for example, Multiple Residence – 40 foot districts, did it not in express terms provide in respect thereof comparably to the references to multiple residence districts in new § 11, such as the requirement drastically limiting the total building area. This uncertainty, which we need not resolve, does not however establish an intent that only M–35 foot districts can be created. No reason comes to mind why multiple residences would be suitable in a 35 foot bulk district and not in a 40 foot bulk district. Nothing in St. 1941, c. 373, in terms restricts the board in its decision as to how to amend the map to create multiple residence districts. We hold that the controlling provision is the grant of power to the board in effect to create such districts by amending the zoning map.

Statute 1941, c. 373, approved June 12, 1941, speaks, therefore, as an acceptance by the General Court of the board's construction of its powers as exemplified in the seven amendments theretofore made to create new combinations of districts. The board's action in each instance had been recorded on the zoning map which is a part of the

statute constituting the zoning law being amended. The Legislature gave the power to create new M bulk-use districts, by amending the map. This was recognition that the extent of the board's amending power is as broad as the board had assumed; failure to restrict the board in respect of its disclosed practice in such a closely related matter is of like significance. *Burrage* v. *County of Bristol,* 210 Mass. 299, 301–302. *Powers's Case,* 275 Mass. 515, 518. *Mullen* v. *Board of Sewer Commrs. of Milton,* 280 Mass. 531, 536. *Lynch* v. *Commissioner of Educ.* 317 Mass. 73, 80–82. See *Assessors of Boston* v. *Boston Elev. Ry.* 320 Mass. 588, 594; *Gordon* v. *State Tax Commn.* 335 Mass. 431, 436–437. Compare *State Tax Commn.* v. *Gray,* 340 Mass. 535, 541–542.

The statute as enacted in 1924 does not show the limitation for which the plaintiffs contend. The statutory grounds for exercise of the power to amend are the broad grounds underlying any exercise of the power to zone; these specifications suggest a power sufficient to meet the needs enumerated. The grounds include (St. 1924, c. 488, § 20) "to meet altered needs of a locality, . . . and to promote the health, safety, convenience and welfare of the inhabitants . . . ." "Any one of the seven grounds . . . [may] form the basis of a change of boundaries." *Bradley* v. *Board of Zoning Adjustment of Boston,* 255 Mass. 160, 173. In that opinion this court said: "Its design is to secure the administrative and executive ability of men of experience and vision in municipal planning to meet the exigencies of the present and the prospective needs of the future . . ." (p. 167). "Extensive powers are conferred on the board to change the boundaries of districts and the zoning map . . ."[5] (p. 170).

[5] Other references in the statute to district boundaries are consistent with a broad or a limited construction. See § 17 ("district boundary lines are the center lines of streets," etc.) and the last paragraph of § 20: "If any area is hereafter transferred to another district by a change in district boundaries either by action of the board of zoning adjustment or by an amendment to this act, the buildings and uses then existing within said area shall be subject to the provisions of this act with reference to existing buildings or uses in the district to which the area is removed." See also, in § 20 as amended by St. 1941, c. 373, § 19: "In all cases where the boundaries of districts are changed so as to include the whole or part of an existing single or general residence district in a zone for less restricted uses . . . ."

We do not agree with the plaintiffs' contention that bizarre combinations could be made by the board in combining use and bulk districts. The board's power is not unrestricted. It is strictly limited by the specifications of conditions, which, as noted, require the application of those standards which support any exercise of the zoning power.

We hold that there is in St. 1924, c. 488, an indication of an intent to grant a broad amending power and that to any extent that there is uncertainty as to original intent it has been resolved by subsequent legislative enactment. The board may establish new combinations of the use and bulk districts prescribed in the statute.

3. We are unable to agree with the conclusion of the judge that what was done constitutes "spot zoning" or that it violates the requirement of uniformity. See *McHugh v. Board of Zoning Adjustment of Boston*, 336 Mass. 682, 688–689. In the quotation in the margin[6] from the judge's

---

[6] "7. *The entire residential portion of the Back Bay has changed since 1924. The neighborhood has changed from one which was predominantly single family dwellings to a neighborhood that is predominantly devoted to multiple family dwelling and institutional uses.* The size, nature and character of its buildings, and the uses to which these buildings are put are unusually uniform throughout the district. Throughout the entire area there is need of new apartment houses. *Commonwealth Avenue and its wide mall and the water side of Beacon Street with the Charles River to the north are peculiarly suitable for high rise construction.*

"8. The area on Commonwealth Avenue from Dartmouth Street to Massachusetts Avenue is equally as suitable for the construction of high rise apartment structures as the area on Commonwealth Avenue from Arlington Street to Dartmouth Street. The residential area of the Back Bay between Dartmouth Street and Massachusetts Avenue is essentially undistinguishable from the area between Arlington and Dartmouth Streets in the type of building and the use thereof *although there has been a greater deterioration in that area west of Dartmouth Street.* The entire residential area of the Back Bay is remarkably homogeneous.

"9. The Board of Zoning Adjustment purported to rezone both sides of Commonwealth Avenue from Arlington Street to 100 feet west of Dartmouth Street and the water side of Beacon Street from Arlington Street to Dartmouth Street. (*The water side of Beacon Street from Dartmouth Street to Massachusetts Avenue had been previously rezoned.*) The rezoned area is typical of the rest of the residential area of the Back Bay and is essentially undistinguishable from it. More particularly the rezoned area on Commonwealth Avenue from Arlington Street to Dartmouth Street is typical of the rest of the residential area on Commonwealth Avenue from Dartmouth Street to Massachusetts Avenue and is essentially undistinguishable from it. The purported rezoning creates an unreasonable uniformity [sic] within a district having the same general characteristics and an area essentially similar to the rest of the neighborhood is set off into a separate district or zone. This constitutes spot zoning."

findings we have underlined those findings which we deem of particular significance. The justification for rezoning is shown by the finding that the neighborhood has changed to (predominantly) multiple dwellings and institutional uses. The justification for singling out Commonwealth Avenue and the water side of Beacon Street is expressly found by the judge. These areas are "peculiarly suitable for high rise construction." The February 28, 1956, rezoning of Beacon Street and back land to the river (see note 3, *supra*) means that, with the rezoning now in issue, all of the peculiarly suitable area has been made R–155 except Commonwealth Avenue west of Dartmouth Street. The only question therefore arises from the omission of a part of the "peculiarly suitable" area within the "remarkably homogeneous" Back Bay.

The findings establish a distinction which the board could notice between conditions east and west of Dartmouth Street. The fact that there has been less deterioration in the rezoned area could be thought to make it more acceptable to tenants in such new high rise buildings as might be built therein. There was evidence which we accept that the nearness of the area east of Dartmouth Street to the Garden and Common and downtown shops makes it an easier area in which to rent. Adjacent to the rezoned Commonwealth Avenue area is the Ritz Carlton Hotel which rises to 155 feet by virtue of the variance validated in *Norcross* v. *Board of Appeal of the Bldg. Dept. of Boston,* 255 Mass. 177; included in that area is the land at the southerly corner of Commonwealth Avenue and Arlington Street on which, by St. 1954, c. 418, is permitted a building of 155 feet.

In these circumstances it is not controlling that there is a need for new apartment houses throughout the Back Bay. The issue is how much of the area is now reasonably to be classified for high rise buildings. The similarity to each other of both sections of Commonwealth Avenue does not justify the conclusion that they are indistinguishable for purposes of resolving that issue. If the judge's conclusion that each is equally suitable with the other for the construc-

tion of high rise apartment structures means that, applying all relevant zoning criteria, they are indistinguishable, it is, as stated, not justified on the facts found or shown.

It was for the board to say where the new district should end. The words used in *Cohen* v. *Lynn,* 333 Mass. 699, 704, are apt. "[The rezoned area] was appropriate in size and in location. The new district had to stop somewhere and it was a matter of legislative discretion how much of the adjacent . . . residence district to include in the new district." See also *Raymond* v. *Commissioner of Pub. Works of Lowell,* 333 Mass. 410, 413–414. In *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 596–597, we said, "a classification as the means for attaining a permissible end is not to be declared invalid 'if any state of facts reasonably can be conceived that would sustain it.' *Rast* v. *Van Deman & Lewis Co.* 240 U. S. 342, 357." Compare *McHugh* v. *Board of Zoning Adjustment of Boston,* 336 Mass. 682, 686; *Shapiro* v. *Cambridge,* 340 Mass. 652. It is peculiarly for the legislative agency to determine the probable demand for high rise sites and the effect of making the area for choice of such sites extensive or relatively limited in relation to the demand, and to guide, accelerate, or retard developing trends in accordance with its judgment of the welfare of the city, applying the stated zoning standards.

The evidence shows a strong view, opposite to that of the board, held by some citizens whose interest in Boston and its sound growth is recognized and understood. But the decision must be made by the representatives to whom is delegated the duty to weigh and balance the evidence, and decide in their best judgment. We have not overlooked the agreed fact that Clarendon Development Corporation at first petitioned for the change of "an area of the Back Bay, approximately twice as large and including" the rezoned areas, and withdrew that petition at the request of the board made "for the reason, among others," that the cost of giving notices would be excessive. There is no basis in this for concluding that the decision was based on expediency and not in the board's best judgment.

The case is distinguishable from *Shapiro* v. *Cambridge,* *supra.* The change there relied on to support a reclassification from industry B to industry A of a part of the industry B area adjacent to a residential district was in the residential district. As it appeared that there would be little, if any, advantageous effect on the residential district resulting from this limited change in its industrial environs we ruled that the rezoned section was insufficiently distinguished in pertinent zoning aspects from the rest of the industry B area for valid reclassification.

4. The board's decision is valid on its face. The board found "that the concept of economic and modern apartment building cannot achieve its maximum development under the 80 foot height limitation, particularly in these areas which have a peculiar suitability because of the river view and open spaces for modern high rise buildings; that an economic and functional obsolescence has been taking place in the area due to the change in character of the residences from single family houses of thirty years ago to small apartments, rooming and fraternity houses, educational institutions and clubs; that there is a market for high rise modern apartments in the city which at present cannot be filled; that the planning board's rezoning study has recognized the need for a change in the height in the area; that an increased height allowance would result in substantial new apartment house construction which would be of definite aid in the urban renewal program for Boston and would be of benefit not only to the area involved but to the entire city. Thus [the board] holds that the highest and best use of the land makes necessary the change in use classification (1) to meet the altered needs of a locality, and (2) to promote the health, safety, convenience and welfare of the inhabitants of the city of Boston. It is certified that such a change is made with reasonable consideration, among other things, of the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land. It is further certified that this

action is taken in accordance with authority given said Board of Zoning Adjustment of the City of Boston by Chapter 488 of the Acts of 1924 and amendments thereto.''

The relevant criteria, which we refer to above, do not permit the conclusion that the board has by its own finding shown spot zoning as in *McHugh* v. *Board of Zoning Adjustment of Boston,* 336 Mass. 682, 688, where the rezoning was of a small lot in a changed area.

5. It is not significant in weighing the legality of the board's action that Clarendon Development Corporation initiated the proceedings which led to the rezoning, *Raymond* v. *Commissioner of Pub. Works of Lowell,* 333 Mass. 410, 412, or that its application for a variance has failed in the Superior Court.

6. Revised Ordinances of Boston, 1947, c. 41, § 18,[7] limits the height of buildings in the rezoned area on Commonwealth Avenue. That this, until and unless changed, may bar construction of high buildings does not limit the board in the exercise of its power.

7. The decree in the Superior Court is reversed. A decree is to be entered stating that the decision of the board of zoning adjustment was not in excess of its authority and no modification is required.

*So ordered.*

---

[7] ''No building or structure or any part thereof hereafter erected or altered on land which abuts on and has an entrance into and is within a distance of one hundred feet from the following parkways; . . . Commonwealth Avenue, from Arlington Street to a line drawn parallel to and one hundred and thirty feet west of Charlesgate West . . . shall be used for a livery or public stable or public garage, or for any mechanical, mercantile or manufacturing purposes, nor, excepting churches and chapels, shall the extreme height of said buildings or structures exceed seventy feet from the mean grade of edgestone or sidewalk on the front facing said parkway, exclusive of such steeples, towers, domes, cornices, parapets, balustrades, sculptured ornaments, chimneys and roofs as the Board of Park Commissioners shall approve. . . .''