**L. C. HAWKINS, Appellant,**

v.

**CITY OF FAYETTE, Missouri, a Municipal Corporation; Jan Fellin; City Treasurer; William Ayres, Mayor; and Kenneth O'Brien, Bob Stewart, Earnest O'Dell, Helen Akins, Bill Fisher, James Shiflett and George Vaughan, past and present members of the Board of Aldermen of the City of Fayette, Missouri, Respondents.**

No. WD 31066.

Missouri Court of Appeals,
Western District.

Aug. 4, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 2, 1980.

Robert C. Smith, Columbia, for appellant; Smith, Lewis & Rogers, Columbia, of counsel.

W. F. Daniels, Fayette and Cullen Cline, Columbia, for respondents; Butcher, Cline & Mallory, Columbia, of counsel.

Before WASSERSTROM, C. J., Presiding, and PRITCHARD and KENNEDY, JJ.

PRITCHARD, Judge.

Appellant, alleging that he is a resident of Fayette, Missouri, an owner of property therein, is entitled to vote therein, and that he is a citizen and taxpayer of said city, filed a petition for declaratory judgment asking that an ordinance of the city increasing the salary of its mayor be declared void. The trial court denied him relief.

William Ayres was first elected as mayor of the city on April 4, 1976. During his first term, the salary was $125.00 per month, plus mileage. On the same night that he took office, the city's manager resigned, effective 30 days thereafter. Ayres, feeling that it was his responsibility as mayor to do so, took over the city manager's duties, receiving therefor no additional compensation.

Ayres had been a life–long resident of Fayette, owning and operating a department store therein, from which the larger part of his income is derived. Since he was elected mayor he had been putting in 40 to 70 hours per week of his time for the city. His duties included supervising all city employees; being at the city power plant 3 to 7 times a day during installation of a new engine which went on for 6 or 7 months; supervising the electric and water utility systems; making applications for state and federal grants and making trips concerning them, assuming the lead for the city in applying for them, and reporting to the Board of Aldermen at its bi–monthly meetings on how he was progressing on grants; preparing the city budget for every year he has been mayor; participating in meetings in Jefferson City of the Mid–Missouri Council of Governments, being secretary thereof; at the direction of the Board of Aldermen, he had represented the city in these additional organizations: Chairman of the Sub–Area Council for the Health Systems Agency for 8 counties, member of the governing

body of the same agency for 60 counties, incorporator of Consumer Energy Corporation Coal Gasification for 2 regions; and secretary for the not–for–profit Emergency Medical Services corporation for 16 counties.

On December 10, 1977, meeting of the Board of Aldermen, a salary of $1,000 per month was discussed, and Ayres made a statement that the job of mayor was costing him money, giving an estimate. This meeting was covered in the Fayette newspaper. The Board did not adopt an ordinance providing for $1,000 per month, but did adopt one calling for $4.00 per hour additional compensation by ordinance dated December 20, 1977.

Ayres, without opposition, was reelected to a succeeding term as mayor on April 4, 1978. After that election, but prior to a Board of Aldermen meeting called by him to be held April 10, 1978, Ayres inquired of the Attorney General whether the ordinance adopted on December 20, 1977, was valid. He was informed that the Attorney General knew of no other official in the state who was paid by the hour. Consequently, and to avoid possible litigation of the matter, Ayres called a special meeting of the Board for April 10, 1978, to see if it could get it resolved, "because I could not follow through with two more years at the time I was putting in on the job for $125.00 per month, and they knew that." That special meeting was held prior to the time Ayres took his oath of office (he being elected April 4, 1978) because he understood that official's compensation could not be increased once his term of office began. At the April 10, 1978, meeting, Ordinance No. 2.500, providing $125.00 per month for the mayor, and Ordinance No. 2.501, providing additional compensation of $4.00 per hour to the mayor, were repealed, and a new ordinance, upon the expressed desire of the Board of Aldermen to clarify the status of the compensation of the mayor, set his annual salary at $12,000 per year, payable $1,000 per month after 7:30 p. m., April 18, 1978, and by Section 4, required that the Mayor perform the following duties in addition to those prescribed by State statutes

and the present ordinances: "1. Prepare the annual budget for the City of Fayette, Missouri. 2. Seek, apply for and administer Federal and/or State grants, subject to Council approval. 3. Monitor and inform Council bi–monthly of status of electrical and water utility systems, both the plants and distribution systems. 4. Day to day supervision of City employees and department heads and reporting bi–monthly to the Board of Aldermen. 5. Represent the City of Fayette and the Board of Aldermen in other miscellaneous organizations, and/or Board of Directors at the direction of the Council. 6. A commitment of 40 hours per week is expected by passage of this Ordinance."

Mo.Const. Art. VII, § 13, provides that the compensation of a municipal officer shall not be increased during the term of office, and § 79.270, RSMo 1978, provides that the salary of an officer of the city shall not be changed during the time for which he was appointed or elected. The determinative issue is whether the duties above, prescribed by the Board of Aldermen, are within those ordinarily performed by a mayor of a fourth class city, i. e., were they incidental to and germane to that office, or were they, in fact, additional duties for which the Board of Aldermen could, through passage of an ordinance, legally provide extra compensation above the regular salary of the mayor?

The City of Fayette is stipulated to be a fourth class city of this state. Its functions are governed by Chapter 79, RSMo 1978. The duties of the mayors are contained in several sections therein: § 79.110 provides that the mayor and board of aldermen shall have the care, management and control of the city and its finances; § 79.120 provides that the mayor shall have a seat in and preside over the board of aldermen, but shall have no vote except in the case of a tie, and he shall exercise a general supervision over all the officers and affairs of the city; § 79.140, he shall approve or veto bills; § 79.180 grants power to the mayor to administer oaths to witnesses; § 79.190, he shall sign commissions and appointments of

elected or appointive officers of the city, and shall sign all orders, drafts and warrants drawn on the city treasury, and cause the city clerk to attest them and affix the city's seal, and to keep an accurate record in a book to be provided for that purpose; § 79.200, he shall enforce all laws and ordinances, and cause all subordinate officers to be dealt with promptly for any neglect or violation of duty; § 79.210, communicate from time to time to the board of aldermen such measures as may, in his opinion, tend to the improvement of the finances, the police, health, security, ornament, comfort and general prosperity of the city; § 79.220, the remission of fines and forfeitures, and to grant reprieves and pardons for offenses arising under the city ordinances; and § 79.230, with the consent of a majority of the board of aldermen, to appoint a treasurer, city attorney, city assessor, street commissioner and night watchman, and also special counsel to represent the city or to assist the city attorney.

■ It is true, as appellant argues, that if extra services which are rendered by a public officer are germane to the official duties of his office, or are merely incidental to those duties, the existence of an ordinance or contract for additional compensation is not enforceable as a general rule. Annotations, 159 A.L.R. 606, 609; 170 A.L.R. 1438 (new duties imposed on officer after taking office); 56 Am.Jur.2d Municipal Corporations, Etc., § 263, p. 317 ["The general rule is that where the duties of a municipal officer have been increased by the addition of duties germane to his office, *in the absence of legislation* authorizing an increase in his salary such additional duties are to be performed without extra compensation." (Italics added.)]. Missouri follows the general rule. See *Becker v. St. Francois County*, 421 S.W.2d 779 (Mo.1967), quoting with approval, 159 A.L.R. 606, but in which there was no statute authorizing payment for extra services performed by a county clerk; *Mooney v. County of St. Louis*, 286 S.W.2d 763 (Mo.1956), where it was not specifically provided in a statute providing extra compensation that it should be for extra duties imposed by another stat-

ute, neither statute referring to the other, and no legislative intent to so compensate could be found; and *State ex rel. Forsee v. Cowan et al.*, 284 S.W.2d 478 (Mo.1955), where it was held that a justice of peace, filling in for another who was called to the armed service, was not entitled to extra compensation as a substitute justice, there being no statute fixing extra compensation, and the extra services were germane to relator's duties as one of the justices of the township.

■ Respondents contend that the ordinance, although enacted after Mayor Ayres was elected, was before he took his oath of office, and therefore before his term began. The statutes speak of a term of office for two years, and that cannot be longer than the time when a successor is elected. § 79.050. The matter of when the oath of office is taken is immaterial to its term. See *Edwards v. City of Kirkwood*, 142 S.W. 1109 (Mo.App.1912), where an attorney who did not take his oath of office as city attorney, accepted the monthly salary of $50.00, and then tried to collect for additional services contracted on a fee basis with the city collector. The court held that the oath of office was a mere incident of the office, and was not indispensable thereto, and the attorney was held not entitled to the claimed extra compensation.

It is clear that the additional compensation provided by the ordinance is referable to the extra or additional duties provided for therein. Thus, the *Mooney case*, supra, is distinguishable.

■ The resolution of the question requires an examination, from a factual standpoint, of the duties performed by Mayor Ayres as prescribed by the ordinance of April 18, 1978, and according to his testimony, with those set forth in the statutes, supra, to determine whether or not they are germane and incidental to the office of mayor of Fayette. In this connection, Missouri subscribes to an exception to the general rule above stated, that if additional services performed are not a part of the regular duties of the officeholder, there is

no constitutional bar to extra compensation therefor. See *Little River Drainage District v. Lassater*, 29 S.W.2d 716 (Mo.1930); *Walsh v. County of St. Louis*, 353 S.W.2d 779, 784 (Mo.1962); and *State ex rel. Harvey v. Sheehan*, 190 S.W. 864 (Mo. banc 1916); holding that a statute requiring certain circuit attorneys to attend coroner's inquests and providing an additional fee therefor did not violate the constitutional provision because it placed upon the officer additional duties and merely provided additional compensation therefor.

It does not appear what duties were prescribed for and were performed by the city manager prior to his resignation but the record shows that his compensation had been $13,500 per year.

Appellant argues that the ordinance duty of preparation of the annual budget by Mayor Ayres was not the performance of any new services because, as his witness, Dr. Robert Karsh, an expert in the field of local government, testified, it was the ordinary custom and practice of mayors of cities of the fourth class *which did not have city managers* to prepare their budgets. It must be remembered that Fayette did not have a city manager during the years Mayor Ayres prepared the budget, and the plain implication of Dr. Karsh's testimony that if there were still one in Fayette, the duty of budget preparation would not fall upon its mayor. Thus, it can be inferred that budget preparation was an additional duty of the mayor which he had not had to assume prior to the city manager's resignation. Nor is there anything in § 79.110 specifying general duties of the Mayor and Board of Aldermen of "the care, management and control of the city and its finances" requiring any of them to perform the details of preparation of the city budget.

Mayor Ayres testified that he inherited the job of applying for and seeking federal grants when he was first elected. Again, there is nothing in § 79.110 that requires him to do the detailed work of making application for state and federal grants, making trips concerning them, assuming the lead in applying for them and reporting to the Board of Aldermen at its bi–monthly meetings on how he was progressing on them, all as he testified, certainly as the trial court found, and notwithstanding the testimony of Dr. Karsh that it was the ordinary custom and practice for mayors of fourth class cities to make those applications (which testimony the trial court could disregard), these detailed duties were not germane and incidental to the office of mayor, as contended by appellant.

The city of Fayette has its own electric and water utility systems. Appellant contends that new duties of the ordinance to "monitor and inform council bi–monthly of the status of electric and water utility systems, both the plants and distribution system," were not other than Mayor Ayres had been performing prior to that time. Mayor Ayres did testify that since he was elected, his duties included supervising all city employees (except the city collector), and being at the city power plant 3 to 7 times daily during the installation of a new engine which went on for 6 or 7 months. Again, it must be remembered that the city manager resigned effective 30 days after Mayor Ayres took office, and undoubtedly he took over the detailed duties of the manager, albeit without pay, those duties being considered to be gratuitous because there was no ordinance providing pay for the extra services at that time, *State ex rel. Smith v. Atterbury*, 270 S.W.2d 399, 403[1–6] (Mo.banc 1954), and indeed, Mayor Ayres received no extra pay therefor during that time. Appellant again refers to § 79.110 as to the duties of the Mayor and the Board of Aldermen as having "the care, management and control of the city and its finances," but adds to that general statement the further phrase, "the benefit of trade and commerce and the health of the inhabitants thereof." In the statute, the latter phrase is preceded by another having to do with the power to enact and ordain any and all ordinances not repugnant to the constitution and laws of this state, and such as they shall deem expedient for the good government of the city. Obviously, then, and contrary to appellant's contention, ordinances enacted for

the benefit of trade and commerce, etc., can have no relation to the supervision of city owned utilities. The obviously general statutory duties of the mayor and the board of aldermen would not include the detailed supervision of the operation of electric and water utilities. Nothing in the statute provides for detailed supervision, and this lack of specificity applies also to the day–to–day supervision of city employees and department heads. To both the supervision of city utilities and employees, the provision of § 79.120 that the mayor "shall exercise a general supervision over all the offices and affairs of the city" (italics added) does not extend to detailed supervision. See the case of Union Electric Co. v. Pacific Indemnity Co., 422 S.W.2d 87, et seq. (Mo.App. 1967), where, although involving a construction of the term "general supervision" in an insurance policy, it was held that the words meant a supervision of an independent contractor's work only to the extent necessary to see that the work was done in accordance with the contract and specifications to cut and trim trees in the area of transmission lines, which work was not done by insured's employees, which then would have been excluded from the policy coverage. Analogously, here the words of § 79.120 mean only that a mayor shall exercise a general supervision over all offices and affairs of the city only to the extent to see that the state laws and the city ordinances are complied with, these being the further words of the statute.

 Appellant next claims that the ordinance duty to represent the city before miscellaneous organizations is one germane and incidental to the office of mayor. His witness, Dr. Karsh, testified that mayors of the cities of the fourth class customarily represented the cities and attended meetings of advisory boards, but that testimony was not binding upon the trial court. There is nothing in the statutes requiring the active participation to the extent testified to by Mayor Ayres in the various organizations having to do with municipal governments. Again, § 79.120, that he should exercise "a general supervision of all the affairs of the city"; § 79.110, dealing

with his obligation "to have the care, management and control of the city"; and § 79.210, to communicate such measures to the Board of Aldermen as may "tend to the improvement of the finances, the police, health, security, ornament, comfort, and general prosperity of the city", are all general in nature. Mayor Ayres was under no obligation to perform the detailed and intricate tasks during his first term—he did so gratuitously. Had the city continued its employment of a city manager, there would have been no necessity of Mayor Ayres taking over the city manager's duties as he obviously did.

 Appellant next contends that item No. 6 of the ordinances that "A commitment of 40 hours per week is expected by passage of this ordinance" cannot be an additional duty because, as argued, the mayor is expected to put in what hours are necessary to fulfil the duties for which he is elected, whether it takes 10 hours per week or 100 hours per week. This provision, being a part of the enacted ordinance, clearly has reference to the additional duties spelled out therein, each of which is above held not to be germane and incidental to the regular, statutory duties of the mayor. There exists substantial evidence to support the findings and conclusions of the trial court, and it is unnecessary to decide what parties initially had the burden of proof on the issues.

The meeting of the Board of Aldermen on April 10, 1978, was a special one called by Mayor Ayres on that same day for 7:00 p. m., at the city hall. He prepared and signed a written notice of the meeting which was hand delivered to three of the board members, and two others were notified by telephone. The matter of salary increase to $1,000 per month had been discussed at the December 10, 1977, meeting, when the ordinance providing for $4.00 per hour for the mayor's additional compensation was adopted. On April 8, 1978, Mayor Ayres made a statement to newspaper reporter, Donald Burke, that he was considering resigning but that there was a possibili-

ty that the council would rescind the hourly pay ordinance, raise the mayor's salary and order a special election at which any interested candidate could run. No notice was given to the public and no published notice was run concerning the April 10, 1978, special meeting. Mr. Burke learned of it when Mayor Ayres called him the next morning, and he was shown a copy of the ordinance increasing the mayor's pay.

█ Appellant claims that there was a violation of the Sunshine Law, § 610.020, RSMo 1978, because no notice of the special meeting of the Board of Aldermen was given to the general public "[by] a reasonable method of notification" as required by that statute and, therefore, the ordinance is void. Respondents say that notice requirements of § 610.020 do not apply because the matter considered at the special meeting was one relating to personnel, which could be a closed meeting, under these words of § 610.025.4., " * * * meetings relating to the hiring, firing or promotion of personnel of a public governmental body may be a closed meeting, closed record, or closed vote." *Hudson v. School District of Kansas City*, 578 S.W.2d 301, 308 (Mo.App.1979), in approving an opinion of the Attorney General, said, "The opinion of the Attorney General of Missouri implicitly recognizes that the personnel exemption of the statute is based upon protection of the privacy of the employee." This quote would relate to general employees, and not to one such as Mayor Ayres, who was the *elected* presiding executive officer of the city. The question of whether his compensation as mayor should be increased in consideration of his assumption of additional duties, which could be performed by another employee such as a city manager, is one of sufficient public importance to require a public notice of any special meeting where those matters would be discussed and voted upon by the board of aldermen.

Without question there was a violation of the Sunshine Law in that there was no public notice of the special meeting. The further question is whether the ordinance adopted increasing the mayor's duties and

his salary should be declared void, and it is one which has never been decided in this state.

Where there is noncompliance with a Sunshine Law, as by failure to give notice or to hold an open meeting, in the absence of a statutory provision declaring an action of a governing body void or voidable, as to whether a court may or should so declare it, there is at least a split of authority. There may be, as appellant suggests, a weight of authority favoring a court–declared invalidity. These following cases illustrate the views taken by various courts under varying statutory provisions of open meetings laws.

In *Dobrovolny v. Reinhardt*, 173 N.W.2d 837 (Iowa 1970), the statute required that meetings of public agencies be public, and each public agency shall give advance notice of the time and place of each meeting by notifying the communications media or in some other way which gives reasonable notice to the public. A county board of education held a meeting without compliance with the notice requirement of the statute, at which meeting an attachment of a school district to two different districts was made. The sole question was whether the attachment was invalid or void. It was noted that the statute limited the remedies [to mandamus, injunction and a criminal penalty of a misdemeanor for a knowing violation of the statute] and it was held that the statute "cannot be reasonably interpreted as providing violation of the provisions thereof render the actions of the public body void or voidable. If the legislature so desired the act could have been easily written to so provide." (173 N.W.2d 841[11].) See also, following the reasoning of the *Dobrovolny* case, supra; *Ex Parte Ala. Public Service Com'n*, 376 So.2d 665, 667 (Ala. 1979), in which it was noted that the Iowa statute was subsequently amended [Iowa Code 1979, § 28, A. 6] to render action taken under a lack of public notice voidable; and *Griswold v. Mt. Diablo Unified Sch. Dist.*, 63 Cal.App.3d 648, 134 Cal.Rptr. 3, 9 (1976).

*Elmer v. Board of Zoning Adjustment of Boston*, 343 Mass. 24, 176 N.E.2d 16 (1961),

had the question of validity of a zoning board's action in the face of a statute requiring all board meetings to be open to the public. One section of the statute authorized an injunction to carry out meetings subsequently held where there was proof of failure of any officer to carry out his responsibilities for public notice of meetings, "but action otherwise duly taken at any meeting shall not be invalidated by the failure of any officer to carry out the said responsibilities for public notice of meetings. * * * The remedy created hereby is not exclusive, but shall be in addition to every other available remedy." The court held (176 N.E.2d 18[2], "Invalidation of action taken, although it would tend strongly to enforce the policy, would not be primarily a remedial measure. There are enough prospective difficulties in the implementation of such policy, particularly as applied to boards and agencies which, after due public hearing, with opportunity for all concerned to present their arguments and counter–arguments, must weigh and determine important legislative, executive and quasi judicial matters (citing case), without putting otherwise valid action at the risk of subsequent determination that the particular deliberations were required to be held under public scrutiny. The Legislature has not gone so far." See also *Reilly v. Board of Selectmen of Framingham*, 345 Mass. 363, 187 N.E.2d 838, 840[4] (1963); and *Nantucket Land C. v. Plan. Bd. of Nantucket*, 5 Mass.App. 206, 361 N.E.2d 937, 942[12] (1977), where it was noted that as to the open meetings law in Massachusetts, "It was not until the effective date of the 1974 statute that the Superior Court was granted jurisdiction, in the exercise of its discretion, to '*invalidate any action* taken at any meeting which violates the provisions of' c. 39 [the open meeting law] of the General Laws." [Italics and brackets added.]

In New Hampshire, the Supreme Court has held that if there is failure to give the notices under that state's "right to know" statute, even though it has no provision that action taken in violation of the statute shall be voidable in a court proceeding, the government "must run the risk that its

action will be invalidated." *Stoneman v. Tamworth School District*, 114 N.H. 371, 320 A.2d 657, 660[6] (1974), and cases cited. The court stated no reason why violation of the "right to know" statute required remand, other than was stated in the cited case of *Hardiman v. Dover*, 111 N.H. 377, 284 A.2d 905, 907 (1971), that the statute must be interpreted broadly to effectuate " 'the primary purpose of the statute to permit free access to public records and proceedings.' "

*Peters v. Bowman Pub. Sch. Dist. No. 1*, 231 N.W.2d 817 (N.D.1975), held that a school board action in executive session was in violation of North Dakota's open meeting law, and that the action was void. No rationale for the holding was given.

In *Bigelow v. Howze*, 291 So.2d 645 (Fla. App.1974), the action of a county commission committee in regard to which of two firms should be awarded a contract to appraise real and personal property, made in Tennessee, was invalidated. Note, however, according to the *Toyah* case, infra, page 378[4], the Florida statute expressly declared that action taken behind closed doors is invalid. Respondents say that the *Bigelow* case is eroded by the decision in *Killearn Prop., Inc. v. City of Tallahassee*, 366 So.2d 172 (Fla.App.1979), but that is not so because the *Killearn* court held merely that there was no violation of the Sunshine Law, and even if there were a violation the city would be estopped to assert it since it sought to disavow the contract alleging that it had itself violated the Sunshine Law.

In *Lower Colorado Riv. Auth. v. City of San Marcos*, 523 S.W.2d 641, 646[7, 8] (Tex. 1975), it was held that the action of the Board of the River Authority increasing electrical rates was invalid because a notice of a 1972 meeting did not comply with the open meeting law. In the there cited case of *Toyah Ind. Sch. Dist. v. Pecos–Barstow Ind. Sch. Dist.*, 466 S.W.2d 377, 378[1] (Tex. Civ.App.1971), it was noted that the Texas statute was silent concerning the validity of action taken at closed meetings, but that it provided for injunctive relief, mandamus, and a criminal liability upon those knowing-

ly participating in a meeting from which the public was excluded. The reasoning of the court was that the statute was mandatory and "to insist that action taken in disregard of its mandatory provisions is insulated from challenge is to utter a contradiction" (page 380[3]), and that the statute, being remedial, should be liberally construed.

*Wolf v. Zoning Bd. of Adjust. of Park Ridge*, 79 N.J.Super. 546, 192 A.2d 305, 308[7, 8] (1963), noted that New Jersey's "Right to Know Law" provided " 'official action taken in violation of the requirements of this act shall be *voidable* in a proceedings in the Superior Court.' " See also *Kramer v. Bd. of Adjust. Sea Girt*, 80 N.J.Super. 454, 194 A.2d 26 (1963).

In *Bogert v. Allentown Housing Authority*, 231 A.2d 147, 150[2] (Pa.1967), it was said, "While the statute provides a remedy [a fine] against the members of the Authority for a violation thereof such remedy is not exclusive; were it otherwise, the entire purpose of the statute would be nullified and that statute could be violated by the Authority with particular impunity." The case was reversed and remanded to give the plaintiffs an opportunity to amend their complaint to plead a violation of the "Right to Know" statute.

See further Anno. 38 A.L.R.3d 1070; and 75 Harvard L.Rev. 1199, 1211, et seq. (1962), and especially the discussion of the remedy of invalidation for violations of open meeting laws, "Both citizens and officials rely on governmental decisions in planning their every day affairs, and to allow the subsequent invalidation of such decisions simply because they were made in violation of ambiguously drawn open meeting laws would create a substantial amount of undesirable uncertainty." This quote, p. 1214, is in accordance with the pronouncement of the *Elmer* case, supra (176 N.E.2d 18[2]). In this connection, note that the *Hudson case*, supra, declined to undo certain actions of the school board, made in violation of the Sunshine Law, by way of mandatory injunction, where the actions had been completed. 578 S.W.2d 312[14], et seq.

The lack of public notice of a special meeting would undoubtedly deprive the public of an opportunity to seek injunctive relief against holding such a meeting without proper notice. Yet, injunctive relief is the *only* remedy which has been provided by the General Assembly to implement the Sunshine Law. Despite the persuasive arguments of some of the cases cited supra, for this court to declare the ordinances raising Mayor Ayres' salary and increasing his duties invalid because of lack of public notice would amount to judicial legislation, which, because of important public considerations, this court ought not to do. It may be that there is a trend in various legislatures to provide for a declaration of invalidity to acts taken in violation of Sunshine Laws, but that is a matter for determination by the General Assembly. "The courts have no proper jurisdiction to accommodate the law of Missouri to the apparent equities of the particular case. As we said by reference in *Harris v. Bates*, 364 Mo. 1023, 270 S.W.2d 763, at page 768, the court cannot supply that which the legislature has, either deliberately, or inadvertently, or through lack of foresight, omitted from the controlling statutes." *State ex rel. Mercantile National Bank at Dallas v. Rooney*, 402 S.W.2d 354, 362[7, 8] (Mo. banc 1966). See also *Sayles v. Kansas City Structural Steel Co.*, 128 S.W.2d 1046, 1054 (Mo. banc 1939), holding that if a statute needs alteration it is for the Legislature, not the courts, to do it.

The judgment is affirmed.

All concur.