529 P.2d 242

Jane IVANCOVICH and Byron Ivancovich, husband and wife, Marjorie O'Connell, Glenn Yokem, Individually and on behalf of others similarly situated, Appellants,

v.

CITY OF TUCSON BOARD OF ADJUST-MENT, Magna Investment & Development Corp., a Utah Corporation, Sierra Investment Corp., an Arizona Corporation, Joseph Kivel and Levy's Department Store, a division of Federated Stores, a Delaware Corp., Appellees.

No. 2 CA–CIV 1599.

Court of Appeals of Arizona, Division 2.

Dec. 19, 1974.

Rehearing Denied Jan. 22, 1975.

Review Granted March 4, 1975.

Kipps & Salter by Gordon S. Kipps, Tucson, for appellants.

Bilby, Thompson, Shoenhair & Warnock, P. C., by Marvin S. Cohen, Chandler, Tullar, Udall & Richmond by Thomas Chandler and Robert E. Lundquist, Tucson, for appellees.

James D. Webb, Tucson City Atty., by Enos P. Schaffer, Asst. City Atty., Tucson, for City of Tucson Bd. of Adjustment (only).

## OPINION

HOWARD, Judge.

■ This appeal challenges the action of the City of Tucson Board of Adjustment granting Levy's Department Store permission to add a third story to the building it leases.[1]

Before discussing the facts of this case we want to compliment counsel on the quality of the briefs filed in this court.

Appellee Levy's Department Store is now leasing a two-story building from appellees Magna Investment & Development Corporation, Sierra Investment Corporation and Joseph Kivel. The store is located in the El Con Shopping Center which includes 13 buildings occupied by such tenants as Penney's Department Store, Montgomery Ward, Steinfeld's, El Rancho

1. Since this appeal the Tucson Mayor and Council have granted a zoning change on the property in question, so that Levy's can build a third story. However, this appeal is not moot since an appeal can still be taken from the rezoning decision.

Market, Skaggs Drugs and many others. Goldwater's Department Store is scheduled to be located near Levy's. The land occupied by the shopping center was in 1968 and is now zoned B-2A which has a maximum height limitation of 35 feet, except for a 200-foot buffer zone between Levy's and the El Encanto subdivision and a 100-foot strip along Broadway. In 1968, prior to constructing the improvement in question, Levy's applied to the Board of Adjustment for a variance to allow it to build a third floor in excess of the 35-foot limitation. This variance was granted by the Board and then set aside on appeal by the Pima County Superior Court on the ground that there was no evidence to support the granting of the variance. Appellees did not at that time pursue the matter any further. Instead, in 1969, they built the present improvement in such a manner that it would allow the addition of a third floor.

In 1973, appellees again requested that the Board grant a variance to build a third floor up to 51 feet 4 inches. Several persons who lived in the El Encanto area, which is adjacent to the shopping center, appeared at the hearing to protest granting of the variance. In addition, some sixty persons residing in El Encanto and in the area north of the shopping center, filed protests.

At the hearing before the Board Mr. Leon Levy described the history of Levy's Department Store from its inception in Douglas, Arizona in 1903. In support of the variance he stated that Levy's had outgrown its space and needed to expand. As he put it, "A business either grows, or it dies." Mr. Levy told the Board that the department store then had more than 800 employees with a payroll of over 4 million dollars which made it "quite a sizeable industry" in Tucson. If permitted to build a third story, he stated that Levy's would add in the next three years about 200 employees and an additional million dollars to the payroll. Furthermore, the expansion would cut down the amount of "outshopping" that occurs in Tucson and keep the money in the community.

The next witness in behalf of granting the variance was Dr. Eric Blech, a consulting economist at the University of Arizona. He testified as to population studies in the Tucson area, stating that the population had grown about 8% per year, a rate higher than was originally anticipated.

Dr. Peter Gillett, a marketing specialist from the school of Business Administration, University of Arizona, stated that there was a general consumer dissatisfaction with the lack of "higher quality merchandise" available in the Tucson area, and many persons for that reason shop outside of the City.

Mr. Henry Quinto, president of Levy's, testified that the store's growth in business volume had been substantially larger than anticipated—approximately 17% per year, in spite of the fact that retail floor space of other Tucson department stores had almost doubled since 1969.

According to Mr. Quinto the retailing industry recognized that when a store reached a level of $155 of sales per square foot of selling and adjacent stock space, it must expand or it will become overcrowded. He stated that Levy's would reach that point by the end of 1974. Before moving to its present location Levy's had occupied another building in the shopping center (presently occupied by Steinfeld's Department Store). He also stated when Levy's exceeded the $155 mark in the old store many comments were received from customers who were unhappy with the situation, and Levy's found by actual analysis of their charge accounts that in the period before they moved to the new store they had lost many customers of long standing then regained them after the new store opened. He told the Board:

"And so, in our experience, we estimate that a loss in volume of about 15%, an actual drop from what would otherwise be had, will result if you go past what the upper limits of the reasonable relationship of space to volume."

When it was pointed out that Levy's could expand by the construction of a basement, Mr. Quinto said that was not considered because, "A basement just isn't Levy's".

Mr. Quinto went on to explain that the proposed third floor would be set back on all sides, that it would not extend as high as the existing machinery and elevator equipment walls above the second floor, and that there would be neither windows nor exterior lights on the third floor.

In response to questions from the Board, Mr. Quinto said that when the third floor space became saturated, Levy's would not seek additional height, but would build a second store at the site it owned at East 22nd Street and Harrison Road in Tucson. He explained that the present store served basically those people within 15 minutes driving time and that the third floor would provide sufficient space for total anticipated growth within that area. He further stated that the third floor would expand the variety of merchandise and should regain many of the outshopping dollars being lost to the Tucson economy.

The next person to testify was Mr. Robert Dempsey, a qualified real estate appraiser. At the time of his appraisal Levy's lease would expire in 26 years and 10 months. Levy's paid the owners of the property as rent a fixed base amount plus a percentage of the gross profits. Mr. Dempsey's appraisal was admitted into evidence at the Board hearing. He had made a study of the effect the projected 15% loss of business due to overcrowding would have on the lessor's interest in the Levy's building and the other property located in the El Con Shopping Center. In his written appraisal he made the following conclusion:

"The present value of the lessor's interest in the leased fee estate for 26 years and 10 months is $5,483,000.00. A lowering of the lease income will result in a value of $4,566,000.00 or a decline in

value of $917,000.00. At the end of 1974 the lease would have 25 years remaining. At the projected volume, the capitalized rental derived from the lease would have a value of $6,557,000.00. A lowering of the lease income will result in a value of $5,404,000.00 or a decline in value of $1,153,000.00." [2]

Mr. Dempsey also submitted a study of the effect of the El Con Center on property values in the El Encanto Development where appellants live. This study concluded that homes in El Encanto Estates from 1968 to the date of the report showed a definite upward trend in market value and no unusual sales activity.

Marvin S. Cohen, Esquire, testified regarding photographs taken of the Levy's building from the closest residences to the west and north. One set showed the existing building and the other as it would appear with the proposed third floor superimposed. The pictures showed that a third floor would have no effect on the view, light or air of the occupants or residents to the west or north. (There were no residents within viewing distance to the east or south.)

Other evidence submitted to the Board established that there was adequate parking for the third floor expansion; that the third floor addition would be well within the fire protection capabilities of the fire department; and that levy's was within the area set by the City Planning and Zoning Commission in 1969 as "strategic locations for highrise development". In addition, prior to the hearing, the Board members had been to the site and in and around El Encanto to see for themselves the situation of the building, setbacks, and views later discussed at the hearing.

The opponents of the variance objected to the creation of more traffic and felt that granting the subject variance would set a precedent for the addition of third

2. From data furnished him the appraiser calculated a rental expectancy for the store in the amount of $504,633 per year. With the gross sales declining to a 15% lower volume, the lessor's interest in the income stream would only be $422,133 per year.

floors to the other buildings located in the shopping center.

The Board of Adjustment granted the variance to add a third floor which would extend to the following heights: Roof, 50 feet; parapet, 51 feet, 4 inches; air handling units, 58 feet. The Board also put the following conditions on the granting of the variance:

"THAT AN AGREEMENT BE MADE BY LEVY'S TO TURN OFF THE SIGN ON THE WEST FACE OF THE BUILDING ONE HOUR AFTER SUNSET; THAT THIS VARIANCE BE LIMITED ONLY TO LEVY'S AND NOT APPLY TO ANY OTHER BUILDING AT EL CON CENTER; AND THAT LEVY'S LANDSCAPE THE CURB AREA ALONG THE WEST WITH PLANTS WHICH WILL GROW TO A HEIGHT OF SIX FEET OR MORE."

The Board also found:

"(1) That the variance is needed to preserve substantial property rights, and will not be detrimental to the public good or impair the purpose of the Zoning Code.

(2) That there are special circumstances or conditions not created by the owner applying to the subject lands, building and use which do not generally apply to the properties in the district, and are not so common as to be reasonably regulated by ordinance.

(3) The Board specifically finds that there is no private or public purpose served in denying the application and in maintaining the height to that stipulated for B–2A zone in this case.

(4) On the third floor addition there are no windows that will face El Encanto residential area, nor are there shadows that will be cast by the addition, to the residential area to the west or to the north.

(5) When the parking saturation is reached at El Con or any other Center, it is my [sic] belief that economics will

be there to build a parking structure. Therefore, relying strictly on the parking as a control of density will not accomplish those aims. We are looking at land use control density as a function of parking and height, and parking at a density control will have little value when the parking structure is built. Therefore we have to make an overt judgment in this case on the specifics of that floor, for that building.

(6) The Fire Department tells us that the proper fire prevention systems installed in the addition will actually minimize fire hazards.

(7) The general criteria concerning this application as a self-imposed hardship are over-weighed by the five unique circumstances shown by the applicant:

a. A large area,

b. Unusual set-back around the entire shopping center,

c. The lack of site interferences,

d. Lack of adverse effects on the neighborhood, and

e. No indication that the extra height would be incompatible with the surrounding neighborhood."

Appellants filed a special action in the trial court which denied relief. On appeal they question the sufficiency of the evidence before the Board to grant a variance. We need only discuss § 23–497(2) of the City of Tucson Code which sets forth the powers of the Board of Adjustment. It provides that the Board shall have the power:

"To authorize upon appeal in specific cases such variance from the terms of this article as will not be contrary to the public interest, where, owing to special conditions, a lateral enforcement of the provisions of this article will result in unnecessary hardship, and so that the spirit of this article shall be observed and substantial justice done."

Section 23–497(2) of the Code further states that in accordance with the forego-

ing the Board of Adjustment shall have the following general powers:

\*　\*　\*　\*　\*　\*

"(c) Where, by reason of exceptional narrowness, shallowness or shape of a specified piece of property at the time of enactment of this article or by reason of exceptional topographic conditions, or other *extraordinary and exceptional situation or condition* of such piece of property, the strict application of any provision of this article would result in *peculiar* and *exceptional practical difficulties* or *exceptional and undue hardship* upon *the owner* of such property, the board shall have the power to authorize, upon an appeal relating to such property, a variance from such strict application, so as to relieve such difficulties or hardships, provided such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of this article.

No grant or variance shall be authorized unless the board specifically finds that the condition or situation of the specific piece of property for which the variance is sought is not of so typical or recurrent a nature as to make reasonably practicable the formulation of a general regulation for such conditions or situations." (Emphasis added)

In reviewing this case we follow the criteria set forth in Mueller v. City of Phoenix, 102 Ariz. 575, 435 P.2d 472 (1967):

"A Board cannot create jurisdiction by finding a fact upon which its jurisdiction depends without evidence in support thereof. [Citation omitted] Thus the sufficiency of evidence is properly reviewable on certiorari in determining whether jurisdictional facts were proved. [Citation omitted] So while this Court may not weigh the evidence introduced below on which a decision is based in order to determine the correctness of the decision reached it will consider such evidence in so far as it may tend to show jurisdiction or lack thereof to render the decision questioned by the certiorari decision. [Citation omitted]" Id. at 579, 435 P.2d at 476.

Furthermore, there is a presumption of validity in favor of the Board's decision and one who attacks it is met with the presumption that it is correct and carries the burden of showing the decision to be against the weight of the evidence, unreasonable, erroneous, or illegal as a matter of law. Mueller v. City of Phoenix, supra. The sole issue for us to decide is whether the lower court was correct in sustaining the jurisdiction of the Board. Thus the court " '. . . will not substitute its judgment for that of the board, even where the question is faulty, debatable and one in which the court would have reached a different conclusion had it been the original arbitor of the issues raised by the application.' " Id. at 581, 435 P.2d at 478.

To be justified in affirming the Board's order, aside from the previously discussed jurisdictional issues, the lower court must find some credible evidence to support the Board's determination.

As far as the Board is concerned, its power and authority to grant a variance is to be exercised sparingly and under exceptional circumstances, if the integrity of the zoning code is to be maintained. To permit any other course would render naught and useless the legislative purpose in enacting the zoning code. Brown v. Beuc, 384 S.W.2d 845 (Mo.App. 1964). The Board cannot amend or repeal any zoning ordinance for this power belongs to the City Council. Nicolai v. Board of Adjustment, 55 Ariz. 283, 101 P. 2d 199 (1940); Brown v. Beuc, supra.

The Board's administrative discretion is limited by the narrow compass of the City Code. It cannot arbitrarily pick and choose the individuals of whom it will or will not require strict compliance with the ordinance.

Rather, the Board must find as a jurisdictional prerequisite to the granting of a

536

variance that the situation or condition of the property in question is *extraordinary* and *exceptional* and that application of the zoning requirement would cause *peculiar* and *exceptional* practical difficulties or *exceptional* and *undue hardship*.

Because of its importance in this case, it is appropriate to begin by discussing the distinction between a "use" variance and an "area" variance.

As stated in 2 R. Anderson, American Law of Zoning § 14.06 (1968), the distinction between "area" and "use" variances, and the imposition of separate requirements for the granting of each type, are inventions of the court. Classification seems to have been undertaken by the courts to permit the granting of variances regarded as trivial without establishment of all the elements of unnecessary hardship. A "use" variance is one which permits a use of land other than that allowed by the zoning ordinance. Thus, a variance which permits a commercial use in a residential district is a "use" variance. Id. at § 14.07. "Area" variances involve such matters as setback line, frontage requirements, height limitations, lot size restrictions, density regulations and yard requirements.

Although the Tucson Ordinance makes no distinction between "use" variances and "area" variances, as is pointed out in 3 R. Anderson, American Law of Zoning, § 14.-45 et seq. (1968), a large number of states read such a distinction into their zoning ordinances and apply less stringent standards in the case of an "area" variance. The prime justification for requiring less for an "area" variance than is required for a "use" variance is that the former does not affect the use of the land. Viti v. Zoning Board of Review, 92 R.I. 59, 166 A.2d 211 (1960).

Most notable of those courts requiring a lesser showing in the case of an "area" variance are the courts of New York. In New York the literal language of the ordinances seemingly limited the power to vary or modify to instances of "practical diffi-

culties" or "unnecessary hardship". In Otto v. Steinhilber, 282 N.Y. 71, 24 N.E.2d 851 (1939), the Court stated the purpose of allowing variances was to prevent the oppressive operation of the zoning law in particular instances when the zoning restrictions were otherwise generally reasonable. It denominated the authority to grant a variance a "safety valve". The court in *Otto* then stated that in order to sustain a variance on the grounds of undue hardship the record must show that:

" . . . (1) the land in question cannot yield a reasonable return if used only for a purpose allowed in that zone; (2) that the plight of the owner is due to unique circumstances and not to the general conditions in the neighborhood which may reflect the unreasonableness of the zoning ordinance itself; and (3) that the use to be authorized by the variance will not alter the essential character of the locality." 282 N.Y. 71, 24 N.E.2d at 853.

In 1956 the case of Application of Village of Bronxville, 1 App.Div.2d 236, 150 N.Y.S.2d 906, aff'd 1 N.Y.2d 839, 153 N.Y.S.2d 220, 135 N.E.2d 724 (1956), was decided. It involved an application for a variance to permit construction of a bank with more floor space than permitted by the zoning regulations. The board found that there were practical difficulties and unnecessary hardship in conforming to the ordinance in that a new conforming building would not provide a reasonable return on the fair value of the land and the building; that the age and condition of the existing building prevented a reasonable return during the brief remaining period of usefulness; that there was a consequent need for replacement and that these facts made the hardship peculiarly severe and unnecessary. The board's opinion was annulled by the trial court on the ground that there was no proof of "unique hardship"; however, the appellate court reversed the lower court pointing out that the variance under consideration in the *Otto* case was a use variance. It held that when the vari-

ance is one only of area it may be granted on the ground of practical difficulties without considering whether or not there is an unnecessary hardship. The Bronxville Court construed the regulations in the disjunctive, applying "practical difficulties" to area variances and undue hardship to use variances.

The New York rule as expressed in *Bronxville* has not been widely accepted. Maryland[3] and Michigan[4] have cited it with approval. 3 R. Anderson, American Law of Zoning § 14.47 (1968), describes rules of other jurisdictions which do not follow the New York approach to area variances yet disclose through their results or rationale that area variances can be approved without showing that literal application of the zoning regulations would deny to the applicant *all beneficial* use of the land. For example, in Rhode Island, relief can be granted if the applicant proves that the regulation imposes a burden which is more than mere inconvenience. Travers v. Zoning Board of Review, 101 R.I. 510, 225 A.2d 222 (1967).

Unlike the regulations involved in the New York cases, which allow variances in cases involving mere practical difficulties or undue hardship, the Tucson ordinance authorizes the Board to grant a variance only in cases of *exceptional* practical difficulties and *exceptional* undue hardship, higher standards than those of New York. Nor are the Rhode Island cases in point since they do not involve an ordinance as restrictive as the Tucson ordinance. Even under looser zoning regulations we have found no case which would uphold the granting of a variance under the circumstances of the case at bench. As is stated in Norcross v. Board of Appeal, 255 Mass. 177, 150 N.E. 887, 890 (1926), cited by appellees:

"Financial considerations alone, however, cannot govern the action of the board. They are bound to take a broader view

than the apparent monetary distress of the owner. Otherwise, there would be no occasion of any zoning law."

The above quote from *Norcross* is apparently the majority rule in regard to area variances. See, 3 R. Anderson, American Law of Zoning § 14.48 (1968).

The evidence before the Board of Adjustment of the City of Tucson at best shows only that Levy's, and in turn the owners of the property, can make more money if allowed to construct a third floor. We find the testimony by the appraiser that the existing building would decrease in value wholly speculative and unsupported by the evidence. It assumes that Levy's would allow the store to become overcrowded and also allow such conditions to prevail over a *25-year period*. This position is entirely unjustified by the evidence. There was no testimony that, even assuming a 15% decline in sales, the return on the land and improvement would be unreasonable. This "hari-kari" theory of valuation is as elusive as the Scarlet Pimpernel and just as fictional. Furthermore, the building floor space could be expanded by the construction of a basement. Levy's answer to such expansion, i. e., it "just isn't Levy's" was an inadequate response.

Appellees have cited several cases which they claim support their position. The one most heavily relied on is Weaver v. Zoning Board of Appeals, 130 Ill.App.2d 1052, 264 N.E.2d 758 (1970). A copy of this opinion was given to the Board and was represented as being exactly on point. The only similarity between that case and the case *sub judice* is the claim that there should be a variance in height because of overcrowded conditions. The difference between the *Weaver* case and the Levy's variance claim are marked, substantial and distinguishing. The zoning ordinance in *Weaver* had been in effect since 1928 when the population was 4,000. The population at the time of the granting of the variance was 40,000.

3. Loyola Federal Savings & Loan Ass'n v. Buschman, 227 Md. 243, 176 A.2d 355 (1961).

4. Indian Village Manor Co. v. City of Detroit, 5 Mich.App. 679, 147 N.W.2d 731 (1967).

538

The building in question was a bank building and the applicant wished to increase the height of the bank building because of overcrowded conditions. The evidence was that the bank could only be used for banking purposes and not for any other commercial purposes because of its design and if it were not used for banking purposes its market value would be 50% less than its market value as a bank building.

Other cases cited by appellees to support their position are not in point. In Norcross v. Board of Appeal, supra, a variance was granted to allow a reasonable rate of return from the land which was disproportionate to the building of a structure in lesser height than that desired by the applicant. In Loyola Federal Savings & Loan Ass'n. v. Buschman, supra, the granting of a variance was upheld because of "practical difficulty" due to the presence of water in considerable quantity only 8 feet below the surface which made it impractical to provide basement parking. In Rosedale-Skinker Imp. Ass'n. v. Board of Adjustment, 425 S.W.2d 929 (Mo., 1968), the applicant was the Southwestern Bell Telephone Company. It desired to add additional floors to the structure housing its telephone exchange equipment. In sustaining the granting of the variance the Missouri Supreme Court pointed out that the building was to some extent a special purpose building built to house telephone exchange equipment; that there was an increase in demand for telephone service; that if the telephone company could not get the variance it would have to erect another building in another location which would result in disruption of telephone service and it would be a "terrible burden" in cost to the public. In Brown v. Board of Adjustment, 469 S.W.2d 844 (Mo.App.1971), there was evidence that if the applicant was not allowed to construct the additional floor, new requirements imposed by state and federal house regulations would compel the owner to cease further operation of its business in the existing structure.

Elmer v. Board of Zoning Adjustment, 343 Mass. 24, 176 N.E.2d 16 (1961), is also inapposite. The Boards of Adjustment in Massachusetts have by statute the right to amend zoning regulations, a power not granted in this state. See, Nicolai v. Board of Adjustment, supra. Appellees cite other cases which are factually distinguishable.

We agree that a more stringent showing is warranted with respect to the more drastic relief inherent in a use variance. The difference between exceptional and undue hardship and peculiar and exceptional practical difficulties is one of degree, the former applying to use variances, and the latter to area variances.

A use variance cannot be granted unless the situation arises where reasonable use cannot be made of the property in a manner consistent with the zoning regulations. An inability to put the property to a more profitable use or loss of economic advantage is not sufficient to constitute undue hardship. It must be shown that the zoning ordinances preclude the use of the property in question for any purpose to which it is reasonably adapted; in other words, can the premises be put to any conforming use with a fair and reasonable return arising out of the ownership thereof?

Such a showing need not be made in the case of area variances. A clear definition of what constitutes peculiar and exceptional practical difficulties has not yet been found and the nature and extent of the showing that warrants an area variance must depend on the facts and circumstances of the particular case.

There being nothing in the record to support the jurisdictional prerequisite for the granting of the variance, the trial court is directed to enter its order annulling and setting aside the decision of the City of Tucson Board of Adjustment granting the variance.

Reversed.

HATHAWAY, C. J., and KRUCKER, J., concur.