SANDY CITY, a municipal corporation, Plaintiff and Petitioner,

v.

SALT LAKE COUNTY, a political subdivision of the State of Utah, Salt Lake County Planning Commission, K. Delyn Yeates, R. Scott Priest, W. Scott Kjar, Steven E. Smoot, Postero–Blecker, Inc., and Chevron U.S.A., Inc., Defendants and Respondents.

No. 900425.

Supreme Court of Utah.

Jan. 17, 1992.

Walter R. Miller, Sandy, for Sandy City.

David E. Yocom, Kent S. Lewis, Salt Lake City, for Salt Lake County and the Salt Lake County Planning Com.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

ZIMMERMAN, Justice:

This matter is here on a writ of certiorari to the court of appeals. We granted certiorari to review that court's affirmance of the district court's summary judgment against Sandy City and in favor of Salt Lake County and the Salt Lake County Planning Commission (collectively "the County"), Messrs. Yeates, Priest, Kjar, and Smoot ("the property owners"), Postero–Blecker, Inc. ("the developers"), and Chevron U.S.A., Inc. ("Chevron"). *See Sandy City v. Salt Lake County*, 794 P.2d 482 (Utah Ct.App.1990). Sandy sued the County, challenging its grant of a conditional use permit to the developers, who were acting as Chevron's agent. The permit allowed the construction of a Chevron station on a .7–acre portion of a 4.18–acre parcel of land in the unincorporated area of the county, immediately across the street from the Sandy boundary. Sandy contended that the proposed construction and the larger 4.18–acre project of which the station was only one phase constituted "urban development" within the meaning of section 10–2–418 [1] of the Code and that under the statute the County could not grant the conditional use permit because the project conflicted with Sandy's master plan for property adjacent to its boundaries.

The district court granted defendants' motion for summary judgment and denied

that of Sandy on the grounds that the project did not constitute urban development and, therefore, did not need to comply with Sandy's master plan. On appeal, the court of appeals did not reach the merits of Sandy's contentions, finding instead that Sandy had waived the issues by not raising them during an earlier rezoning of the entire 4.18–acre parcel. We granted certiorari to determine whether Sandy had waived its claims and whether the project constituted urban development as defined by Code section 10–1–104(11).[2] We find that the court of appeals improperly relied on waiver in declining to reach the merits and that the district court erred in its ruling on the merits. We remand the matter to the district court for further proceedings consistent with this opinion.

This case turns on the interpretation of sections 10–2–418 and 10–1–104(11). Section 10–2–418 prohibits urban development of land in unincorporated areas within one-half mile of the boundary of a municipality if the municipality has declared an intent to expand to include the area and the municipality is willing to annex the territory. Utah Code Ann. § 10–2–418 (1986). Section 10–1–104(11) defines urban development as, inter alia, "a commercial or industrial development for which cost projections exceed $750,000 for any or all phases." Utah Code Ann. § 10–1–104(11) (1986). The parties disagree on two issues. First, what expenses should be included in the development's cost projections for purposes of determining whether the statute's bar on urban development is triggered? Sandy argues for the inclusion of land and fixture costs, while the County contends that cost projections should encompass

---

1. In pertinent part, section 10–2–418 reads as follows:

 Urban development shall not be approved or permitted within one-half mile of a municipality in the unincorporated territory which the municipality has proposed for municipal expansion in its policy declaration, if a municipality is willing to annex the territory proposed for such development under the standards and requirements set forth in this chapter; provided, however, that a property owner desiring to develop or improve property within the said one-half mile area may notify the municipality in writing of said desire and identify with particularity all legal and factual barriers preventing an annexation to the mu-

 nicipality. At the end of 12 consecutive months from the filing with the municipality of said notice and after a good faith and diligent effort by said property owner to annex, said property owner may develop as otherwise permitted by law.

 Utah Code Ann. § 10–2–418 (1986).

2. Section 10–1–104(11) provides: "'Urban development' means a housing subdivision involving more than 15 residential units with an average of less than one acre per residential unit or a commercial or industrial development for which cost projections exceed $750,000 for any or all phases." Utah Code Ann. § 10–1–104(11) (1986).

only the building shell. Second, should cost projections include all units and phases of a multiphase commercial subdivision? Sandy argues that the statute targets developments as a whole, while the County contends that each unit and phase should be considered separately.

In reviewing a grant of summary judgment, we view the facts in a light most favorable to the party against which the motion was granted. *Schurtz v. BMW of North Am., Inc.*, 814 P.2d 1108, 1112 (Utah 1991); *Geneva Pipe Co. v. S & H Ins. Co.*, 714 P.2d 648, 649 (Utah 1986). We state the facts in this case accordingly.

This dispute concerns approximately 4.18 acres of property on the northwest corner of the intersection of 1300 East and 10600 South, located on the edge of an unincorporated island of county land surrounded by Sandy City. The parcel is across the street from Sandy, separated only by 1300 East. *See* Appendix. Before the events described below, the property was zoned rural residential, or Residential R-1-8, and was therefore reserved for single-family dwelling lots not less than 8,000 square feet in area. The Salt Lake County master plan, adopted in 1976, reserved the property for rural residential development. Sandy City also anticipated residential uses on the property because its master plan, adopted in 1979, allowed commercial development on only one corner of an intersection. Sandy had already approved commercial development on the adjacent corner, which was in Sandy. Additionally, Sandy had adopted a policy declaration that expressed its willingness to annex unincorporated territory that included the 4.18-acre site. *See* Utah Code Ann. § 10-2-414 (1986).

The property owners did not seek annexation by Sandy City. Instead, in April of 1987, the developers requested that Salt Lake County rezone the 4.18 acres of property from rural residential to Residential RM-ZC (office) and Commercial C-Z so that they could develop a multiphase commercial subdivision on the property. In their application for rezoning, the developers stated that "well known commercial tenants" such as McDonald's, Circle K Food Stores, Minit-Lube, and Mark-10 Car Wash had "expressed extreme interest in

locating at [the] site." At the time of application, the developers made no representations about the cost of the commercial subdivision, even though the rezoning application form asked for the estimated value of the project, including land value "if applicable." Nearby residents initially opposed the development, but their concerns subsided when they were told that the property owners "would be the developer[s] of the whole project and not piecemeal like has happened before."

The planning commission conducted three hearings on the rezoning, on April 28, May 12, and June 23, 1987. Sandy representatives did not attend the hearings, but Sandy had filed a written objection to the rezoning on April 21, 1987. The statement recommended disapproval of the proposal because office and commercial uses conflicted with Sandy's master plan. Sandy asked that the "developer[s] be encouraged to work with Sandy on annexation and zoning" and warned that "[p]iecemeal development should be discouraged." In this April 21 statement, Sandy made no claim that the proposed development constituted prohibited "urban development" in violation of section 10-2-418. It objected only to the development's conflict with the Sandy master plan and with the report of a citizen's group. Based on this written objection, planning commission staff reported at the first two rezoning hearings that Sandy opposed the rezoning because of its policy of allowing commercial zoning on only one corner of a major street intersection.

At the June 23 hearing, the planning commission unanimously recommended the rezoning of the 4.18-acre parcel. The board of county commissioners approved the planning commission's recommendation on August 5, making the rezoning final. *See* Salt Lake County, Utah, Ordinance ch. 19.90.010 (1988). At the county commission meeting, a deputy county attorney stated that although he believed the restriction on urban development costing more than $750,000 applied only to individual phases of a multiphase development, "it [was] something that [was] not totally clear under the law ... [and] Sandy could object to that anyway." The deputy county attorney did not specify when Sandy should make this objection. No Sandy representa-

tive attended the hearing, which was noticed in the *Salt Lake Tribune,* but the commissioners were aware of the objections Sandy had filed in April. The County published the rezoning ordinance on August 15, 1987. It became effective August 20, 1987.

Six days after the ordinance became effective, the developers, acting as agent for Chevron, applied for a conditional use permit to build a Chevron station on .7 acres of the 4.18–acre parcel of land. The application estimated the value of the project at $250,000, including land. On September 18, 1987, Sandy filed a written objection with the County, recommending that the planning commission deny the conditional use permit. That same day, Sandy petitioned the board of county commissioners to reconsider the rezoning of the 4.18–acre parcel. We will describe each of Sandy's September 18 filings in turn.

Sandy's written objection to Chevron's conditional use permit stated that the area proposed for the service station fell within the boundaries of Sandy's annexation declaration, that the developers had not attempted to annex the property to Sandy, and that Sandy was "currently considering annexation of the property." Sandy also requested "complete information on the *entire* commercial tract to be developed (not just individual piecemeal projects), prior to further consideration of this matter by the County and prior to the granting of any permits." There is no evidence that the County supplied Sandy with such information.

Sandy's written request that the commissioners reconsider the rezoning took a different approach. For the first time, Sandy explicitly claimed that County approval of the development would violate section 10–2–418. Sandy stated that the property was within the area it had declared for annexation, that the proposed construction constituted urban development within the meaning of section 10–2–418, and that the property owners had not attempted to annex the property to Sandy. Consequently, Sandy stated, the County erred in encouraging the owners and developers to rely on rezoning and use permits that were invalid under the statute. On September 30, the board of county commissioners refused to hear Sandy's appeal, stating that the county commissioners lacked the authority to rescind a zoning action and directing Sandy to take its objections to the planning commission during the conditional use permit process.

The planning commission heard Chevron's application for a conditional use permit on September 22 and October 13, 1987. A portion of the testimony at the September 22 hearing concerned the value of the development. Chevron's representative estimated the value of the service station at $175,000, exclusive of land and fixtures. Chevron's representative further stated that the cost of the property was $760,000 for two pads and that Chevron would develop only one pad. At the same hearing, the Salt Lake County director of development services acknowledged that when developed, the value of the entire 4.18–acre site would exceed $750,000 and stated that the issue of how to compute the value of a development "[would] have to be addressed with the cooperation of Salt Lake County and Sandy City."

Representatives of Sandy attended the September 22 hearing and protested the conditional use permit because the development conflicted with Sandy's master plan and constituted urban development within the meaning of section 10–2–418. Furthermore, Sandy's attorney told the planning commissioners that Sandy was willing to annex the property and would have done so if the owners or developers had so requested.

The planning commission held a second hearing on the conditional use permit on October 13. There, Chevron's representative estimated the value of the undeveloped .7–acre Chevron site at $200,000, yielding a total estimate of $375,000 for the service station. As at the September 22 hearing, representatives from Sandy protested the conditional use permit, stressing that because the $760,000 value of Chevron's land pads exceeded the $750,000 threshold prescribed in section 10–1–104(11), the project constituted urban development. Nevertheless, the planning commission unanimously approved Chevron's conditional use permit. Sandy appealed the approval to the board of county commissioners, which upheld

Chevron's conditional use permit on October 21.

In a related development, McDonald's Corporation applied for a conditional use permit on September 30, 1987, roughly one month after Chevron had begun its conditional use process. McDonald's requested permission to build a restaurant on another plot of the 4.18–acre parcel, adjacent to the plot reserved for the Chevron station, and estimated the value of the project at $300,-000, including land. At the time, McDonald's had not yet purchased the plot from the property owners. The planning commission approved McDonald's conditional use permit on October 27. Sandy appealed to the board of county commissioners, which upheld the planning commission's approval on December 9.

Sandy filed suit in Third District Court for Salt Lake County on November 6, 1987, alleging, inter alia, that the County's approval of Chevron's conditional use permit violated section 10–2–418 of the Code.[3] Utah Code Ann. § 10–2–418. Sandy challenged McDonald's conditional use permit in a separate proceeding, which is also before this court (Docket No. 890211).

In the Chevron proceeding before the district court, Sandy submitted an affidavit of a licensed appraiser to challenge the value Chevron, McDonald's, the property owners, and the developers had assigned to the development in support of its motion for summary judgment. The appraiser estimated the fair market value of the Chevron development to be in the range of $660,000 to $760,000 and the fair market value of the McDonald's development to be in the range of $900,000 to $1,100,000. He included the land costs, land improvements, building shells, fixtures, tenant finish, furnishings, and equipment in his estimates. He appraised the undeveloped Chevron land at $210,000 and the undeveloped McDonald's land at $275,000. His findings contradicted defendants' in all but one respect: Both Sandy and the County agreed that when developed, the value of the entire 4.18–acre parcel would exceed $750,-000.

On cross-motions for summary judgment, the district court granted the County's motion for summary judgment and denied that of Sandy. The court found that the County acted properly in rezoning the property and granting Chevron's conditional use permit, ruling that the project did not constitute urban development because Sandy had not clearly stated that it would annex the property and because the value of the project did not reach the $750,000 threshold required to trigger application of the statute. The court applied section 10–1–104(11)'s $750,000 threshold only to the discrete Chevron project of the multiphase commercial subdivision and excluded the value of land and fixtures from the cost projections of the development. Under such an interpretation, the cost projections of the Chevron project fell below section 10–1–104(11)'s $750,000 threshold. Therefore, the court ruled, Chevron was under no obligation to petition Sandy for annexation. The district court also stated that Sandy appeared to have waived its right to object to the rezoning, but it did not explain what failure on Sandy's part extinguished its right to sue.

The court of appeals affirmed the district court's ruling but did not reach the merits of the case. The court of appeals held that Sandy had waived its right to pursue its objections to the rezoning in district court because Sandy had not appealed the rezoning to the county board of adjustment. Instead, Sandy had waited until the granting of the conditional use permit to press its claims and had not attempted annexation of its own accord. For reasons it did not explain, the court of appeals apparently assigned Sandy, not the owners or developers, the burden of attempting annexation. We granted certiorari to determine whether the County's actions violated state statutes and whether Sandy had waived its claims by failing to annex the property or contest the rezoning before the county board of adjustment.

 We first note the applicable standard of review. Summary judgment is ap-

---

3. The property owners, the developers, and Chevron were also defendants in the third district suit. Sandy and the County stipulated to the dismissal of these defendants before the appeal reached our court.

propriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Rollins v. Petersen,* 813 P.2d 1156, 1158 (Utah 1991); *Landes v. Capital City Bank,* 795 P.2d 1127, 1129 (Utah 1990); *Utah State Coalition of Senior Citizens v. Utah Power & Light,* 776 P.2d 632, 634 (Utah 1989). Because summary judgment is granted as a matter of law rather than fact, we are free to reappraise the trial court's legal conclusions. *Hunt v. Hurst,* 785 P.2d 414, 415 (Utah 1990). We grant no deference to the trial court's conclusions of law but review them for correctness. *Ward v. Richfield City,* 798 P.2d 757, 759 (Utah 1990); *State ex rel. Division of Consumer Protection v. Rio Vista Oil Ltd.,* 786 P.2d 1343, 1347 (Utah 1990); *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

■ Furthermore, we note that the County errs in cautioning us to defer to the board of county commissioners' legal conclusion that the Chevron project and the larger commercial subdivision of which it is only one part are not urban development under section 10–2–418. This is not a case in which we are attempting to second-guess the County's lawful exercise of legislatively delegated discretion. *See, e.g., Sandy City v. City of South Jordan,* 652 P.2d 1316, 1318–19 (Utah 1982); *Naylor v. Salt Lake City Corp.,* 16 Utah 2d 192, 193–94, 398 P.2d 27, 29 (1965). In this case, we are deciding whether the County overstepped the bounds of its legislatively delegated authority. The interpretation of sections 10–2–418 and 10–1–104 and the correct application of the doctrine of waiver are pure questions of law. The County's technical experience in planning and zoning is of no relevance in deciding these legal issues. *See Silver v. Tax Comm'n,* 820 P.2d 912, 914–15 (1991); *Savage Indus., Inc. v. Tax Comm'n,* 811 P.2d 664, 666–67 (Utah 1991); *Chris & Dick's Lumber & Hardware v. Tax Comm'n,* 791 P.2d 511, 513–14 (Utah 1990); *Hurley v. Board of Review of Indus. Comm'n,* 767 P.2d 524, 526–27 (Utah 1988); *Utah Dep't of Admin. Serv. v. Public Serv. Comm'n,* 658 P.2d 601, 608 (Utah 1983).

This case presents us with two issues: whether Sandy waived its right to pursue its objections in the district courts and whether the Chevron development and the larger project of which it was part constituted urban development and therefore could not be permitted by the County under the applicable statutes. We first address the question of waiver. Both Sandy and the County argue that the court of appeals erred in holding that Sandy waived its objections to the rezoning and the issuance of the conditional use permit.

The court of appeals held that Sandy had waived its claims for two reasons. First, Sandy failed to attempt annexation; second, it failed to appeal the County's decision to rezone the 4.18–acre parcel to the board of adjustment. Both grounds are incorrect.

■ On the question of annexation, we hold that the court of appeals mistakenly imposed the burden on Sandy to initiate annexation of the territory. The court apparently believed that section 10–2–418 requires municipalities to prevent urban development on their borders by staging a preemptive annexation strike of property proposed for the development projects. This requirement conflicts with section 10–2–418, which details the circumstances for annexation of unincorporated territory proposed for urban development.

Contrary to the court of appeals' belief that Sandy waived its claims by failing to annex the land, section 10–2–418 imposes no annexation burden on a city other than that it propose municipal expansion for the territory in its policy declaration and be "willing" to annex the territory "under the standards and requirements set forth in this chapter." Utah Code Ann. § 10–2–418. Instead of requiring cities to take positive steps toward annexation, the statute shifts the burden of showing that annexation is not feasible onto a property owner who wishes to avoid the development limitations of section 10–2–418. Under that section, a property owner wanting to avoid annexation and limitations on urban development "may notify the municipality in writing of [his or her desire to

avoid annexation] and identify with particularity all legal and factual barriers preventing an annexation to the municipality." *Id.* After a year of "good faith and diligent effort" to annex, the property owner may develop as otherwise permitted by the County. *Id.*

■ Having determined that the statute inflicts no burden on Sandy to initiate annexation, we examine whether Sandy met the requirements the statute does impose, that is, that Sandy proposed annexation of the territory and was willing to annex it. With respect to the proposal, it is uncontroverted that Sandy adopted a policy declaration that officially lists the unincorporated areas it is willing to annex, including the 4.18 acres at issue here. The district court held that Sandy was insufficiently willing to annex the property, stating that Sandy's statements that it was considering annexation, that it desired annexation, and that it would have granted annexation had the property owners so petitioned fell short of section 10–2–418's "willingness" requirement.

Although it is unclear why the district court drew this conclusion, it may have believed that the phrase "under the standards and requirements set forth in this chapter" modified the willingness requirement of the statute and consequently imposed a stricter, yet unspecified, standard for "willingness." If such a reading underlay its decision, the district court was mistaken. Under the "last antecedent" rule of statutory construction, the statute's "standards and requirements" phrase modifies only the verb "to annex," not the city's willingness to incorporate the territory. *See Salt Lake City v. Salt Lake County,* 568 P.2d 738, 740 (Utah 1977). The statute's willingness requirement is unmodified and undefined. The Code requires nothing more of the city than a policy declaration and a bare willingness to annex under the procedures outlined in the statute.

Because the statute places the burden to avoid annexation on the property owner and does not qualify the willingness to annex that a city must display, we decline to require the city to take any further steps than those specified in the statute itself. In this case, Sandy exceeded the requisite steps to protect its right to annex. Sandy had adopted a policy declaration listing its willingness to annex the 4.18 acres at issue here. In its written objection to the proposed rezoning, Sandy asked that the "developer[s] be encouraged to work with Sandy on annexation." The Sandy City attorney told the planning commission that if the property owners and developers had petitioned for annexation, Sandy would have annexed the property. Finally, Sandy recommended that the planning commission deny Chevron's conditional use permit because Sandy was "currently considering annexation of the property." Such actions more than sufficed to declare Sandy's willingness to annex under the language of section 10–2–418.

Having determined that Sandy did not waive its rights by failing to meet the requirements of section 10–2–418, we next examine whether failure to abide by state or county time limitations or appellate procedures precluded Sandy's suit in the district court.

■ As a threshold matter, we note that the court of appeals mistakenly relied on a statute pertaining to appeals from actions of *city* governments to bar Sandy's suit protesting the actions of a *county* government. The court of appeals held that because Sandy did not appeal the County's rezoning decision pursuant to section 10–9–9 of the Code, it was precluded from questioning the legality of the rezoning before the district court. *Sandy City v. Salt Lake County,* 794 P.2d 482, 491 (Utah Ct. App.1990) (citing Utah Code Ann. § 10–9–9 (1986)). The court of appeals stated that Sandy should have contested the legality of the rezoning before the city board of adjustment established by section 10–9–9 instead of waiting for the conditional use process to raise the issue. "Because Sandy City could and should have raised this issue earlier, we find that it is precluded from raising it now." *Sandy City,* 794 P.2d at 491.

■ This was error. First, as discussed below, boards of adjustment are powerless to act on questions of zoning or rezoning. Even if, as the opinion suggests in footnote 1, the court of appeals intended to direct Sandy to the county board of

adjustment, the board would have had no jurisdiction over Sandy's claim. Second, section 10–9–9 applies only to the actions of municipalities, not counties. *See* Utah Code Ann. §§ 10–1–106, 10–9–9 (1986). The court of appeals may have assumed that cities and counties are interchangeable entities governed by interchangeable statutes, but this is not the case. Both the legislature and this court have stressed "that the respective statutes dealing with cities and counties confer different powers." *Mountain States Tel. & Tel. Co. v. Salt Lake County,* 702 P.2d 113, 116 (Utah 1985); *see also* Utah Code Ann. § 10–1–104(1) (1986). Section 10–9–9 concerns only city zoning decisions and has no application whatsoever to appeals taken from the actions of county governments.[4]

Having determined that the court of appeals relied on an inapposite statute to bar Sandy's claim, we now examine whether there is any other bar to Sandy's suit in the district court. Because the parties have not briefed the question of the applicable statute of limitations, we do not decide which statute might apply, except to say that under any conceivable statutes, this action was timely, as Sandy filed it only sixteen days after the board of county commissioners upheld Chevron's conditional use permit. The only other possible bars to Sandy's action are section 17–27–16 and county ordinance 19.92.070. *See* Utah Code Ann. § 17–27–16 (1987) (repealed, effective July 1, 1992); Salt Lake County, Utah, Ordinance ch. 19.92.070 (1988). Neither of these enactments erects a barrier to Sandy's suit in the district court. We discuss each in turn.

■ Section 17–27–16 establishes the procedure for appeals to county boards of adjustment, which are appellate bodies appointed by the county commissioners. The statute limits the boards' powers, allowing them to hear only alleged errors in zoning *enforcement* decisions. Utah Code Ann. § 17–27–16. As their name implies, boards of adjustment provide important elasticity in the application of zoning ordinances to avoid arbitrary or confiscatory consequences at odds with the zoning's general purpose and intent. *Florentine v. Darien,* 142 Conn. 415, 425, 115 A.2d 328, 332–33 (1955). Boards of adjustment can tailor a zoning or rezoning ordinance to specific, unforeseen circumstances, but they lack the authority to determine zoning classifications of their own accord. *Provo City v. Claudin,* 91 Utah 60, 68–69, 63 P.2d 570, 574 (1936).

■ The court of appeals seems to fault Sandy for not appealing the rezoning to the county board of adjustment, evidently because it considered rezoning a proper subject for review by the adjusters. *Sandy City,* 794 P.2d at 484 n. 1, 491. The court of appeals was mistaken. The board of adjustment could have taken no action on Sandy's claims because Sandy was protesting the sheer illegality of the rezoning, not seeking a variance or exception to circumvent some unjust hardship in its application. Even in its opposition to Chevron's conditional use permit, Sandy was in essence attacking the rezoning itself, saying that the conditional use contradicted the area's legitimate zoning classification. Because under state law the board would have had no authority to hear Sandy's claims, Sandy's failure to appeal the rezoning to the board of adjustment does not preclude its suit in the district court. *See*

---

4. We also note that the court of appeals mistakenly applied a statute pertaining only to municipalities to determine the standard of review in this case. Section 10–9–15 provides that a party aggrieved by the action of a city board of adjustment "may have and maintain a plenary action for relief therefrom in any court of competent jurisdiction...." Utah Code Ann. § 10–9–15 (1986). Drawing from our opinion in *Xanthos v. Board of Adjustment,* 685 P.2d 1032, 1034 (Utah 1984), the court of appeals declared that the language "relief therefrom" presupposed the continued existence of the administrative action and therefore suggested an appeal rather than a trial de novo. Consequently, the court of appeals confined its review to the administrative

record, holding that "a de novo trial is inappropriate." *Sandy City,* 794 P.2d at 486.

This was error. First, section 10–9–15 applies only to municipalities, not to counties. *See* Utah Code Ann. §§ 10–1–106, 10–9–15. Second, section 10–9–15 applies only to relief sought from the actions of the board of adjustment, not from the actions of the planning commission or the board of county commissioners. *See* Utah Code Ann. § 10–9–15. At the time, no analogous statute regulated legal grievances arising from the actions of Salt Lake County or the planning commission; consequently, there was no basis for the court of appeals to confine its review to the administrative record.

Utah Code Ann. § 17–27–16. "[T]he doctrine of exhaustion of remedies does not require one to initiate and participate in proceedings where an administrative agency clearly lacks jurisdiction...." *Engelmann v. Westergard*, 98 Nev. 348, 353, 647 P.2d 385, 389 (1982); *see also Johnson v. Utah State Retirement Office*, 621 P.2d 1234, 1237 (Utah 1980); *Tiernan v. Trustees of California State Univ. & Colleges*, 33 Cal.3d 211, 655 P.2d 317, 320–21, 188 Cal.Rptr. 115, 120 (1982).

■ Finally, Sandy acted properly under the applicable county ordinance. In establishing its board of adjustment, Salt Lake County granted the board power to "hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made in the enforcement of [the zoning] title." Salt Lake County, Utah, Ordinance ch. 19.92.070. Although the parties and lower courts in this case did not address this issue, one could argue that the ordinance's broad language confers plenary power on the board of adjustment to hear appeals from all provisions of the zoning title, including zoning and rezoning. This interpretation is untenable. As this court has said before, "[T]he passage of general zoning ordinances and the determination of zoning policy [are] properly vested in the legislative branch." *Scherbel v. Salt Lake City Corp.*, 758 P.2d 897, 899 (Utah 1988). As legislative functions, the powers of zoning and rezoning cannot be delegated to a quasi-judicial body such as a board of adjustment.[5] *See, e.g., Provo City*, 91 Utah at 68–69, 63 P.2d at 574; *Nicolai v. Board of Adjustment*, 55 Ariz. 283, 290, 101 P.2d 199, 201 (1940); *Ivancovich v. City of Tucson Bd. of Adjustment*, 22 Ariz.App. 530, 529 P.2d 242, 247 (1975); *Josephson v. Autrey*, 96 So.2d 784, 787–88 (Fla.1957); *May-*

*flower Property, Inc. v. City of Fort Lauderdale*, 137 So.2d 849, 853 (Fla.Ct. App.1962); *Windsor Hills Improvement Ass'n v. Mayor & City Council*, 195 Md. 383, 393, 73 A.2d 531, 535 (1950); *Brown v. Beuc*, 384 S.W.2d 845, 851 (Mo.1964); *State ex rel. Nealy v. Cole*, 442 S.W.2d 128, 131 (Mo.Ct.App.1969); *Alcorn v. Rochester Zoning Bd. of Adjustment*, 114 N.H. 491, 494, 322 A.2d 608, 610 (1974), *appeal after remand*, 115 N.H. 383, 341 A.2d 269 (1975); *Clark v. Board of Zoning Appeals*, 301 N.Y. 86, 90–91, 92 N.E.2d 903, 904 (1950); *Swartz v. Wallace*, 87 A.D.2d 926, 450 N.Y.S.2d 65, 68 (1982); *Vinson v. Medley*, 737 P.2d 932, 937 (Okla.1987); *Glasgow v. Beaty*, 476 P.2d 75, 77 (Okla.1970); *Reddoch v. Smith*, 214 Tenn. 213, 379 S.W.2d 641, 645 (1964); *Board of Adjustment of City of San Antonio v. Willie*, 511 S.W.2d 591, 593 (Tex.Ct.App.1974).

We refuse to interpret the ordinance as sanctioning an invalid delegation of powers. Because the Salt Lake County board of adjustment lacked legitimate authority to review the rezoning, Sandy was under no obligation to appeal to a body that had no jurisdiction to hear its complaint. *Engelmann*, 98 Nev. at 353, 647 P.2d at 389; *Tiernan*, 655 P.2d at 320–21, 188 Cal.Rptr. at 120; *Johnson*, 621 P.2d at 1237. Under both state and county law, therefore, Sandy filed its action in a timely manner.

■ Having determined that the court of appeals erred in relying on waiver, we now turn to the district court's determination that the 4.18–acre project did not constitute urban development under the Code. Section 10–2–418 prohibits urban development of unincorporated territory within one-half mile of a municipality if the municipality has proposed the territory for municipal expansion in its policy declaration and is willing to annex the property. Sec-

**5.** Our decision in *Scherbel v. Salt Lake City Corp.*, 758 P.2d 897 (Utah 1988), is not to the contrary. In *Scherbel*, we held that under the council-mayor form of city government, appeals from the planning commission's denials of building permits should go to the city board of adjustment instead of the city council. *Scherbel* involved the denial of a building permit, a zoning enforcement decision that differs from the legislative functions of zoning and rezoning at issue here. *See id.* at 897. Furthermore, the court based its opinion in *Scherbel* in part on the separation of powers within a council-may-

or form of city government. *See id.* at 899; *see also* Utah Code Ann. § 10–3–1209 (1986). This case concerns a board of county commissioners vested with combined legislative and executive powers. *See* Utah Code Ann. § 17–5–19 (1987). Finally, as Justice Durham, writing for the court, noted in *Scherbel*, " '[T]he statutory provisions regarding county boards of adjustment are entirely different from those concerning city boards of adjustment.' " *Id.* at 899 n. 4 (quoting *Chambers v. Smithfield City*, 714 P.2d 1133, 1137 (Utah 1986)).

tion 10–1–104(11) defines urban development as a residential subdivision of fifteen or more houses with an average of less than one acre per house or "a commercial or industrial development for which cost projections exceed $750,000 for any or all phases." The district court interpreted this statute to exclude land and fixture costs and encompass only discrete elements of a multiphase, multi-unit development. Therefore, the court held, the 4.18–acre project did not constitute urban development because Chevron's part of the multiphase, multi-unit project did not reach the $750,000 threshold required to trigger the restrictions of section 10–2–418. We hold that the district court misinterpreted the statutes and remand for proceedings under the correct reading of the statutes, as outlined below.

■ The statutes' purpose and plain language convince us that the Utah legislature intended to create a low threshold for triggering compliance with the annexation statute. The legislature's purpose was to ensure that no significant development took place near a municipality without its approval. The legislature clearly prefers that cities provide urban services to developing areas and has designated annexation as the means by which those services should be extended. *See* Utah Code Ann. § 10–2–401 (1986). Islands of unincorporated territory surrounded by municipal boundaries impede the efficient and cost-effective delivery of services and therefore should be annexed to cities. *See* Utah Code Ann. §§ 10–2–401(5), 10–2–417(1)(d) (1986). In order to ensure that cities enjoy every opportunity to provide services to developing areas, the legislature has forbidden urban development of unincorporated territory within one-half mile of a city if the city has expressed an intent to annex the territory.

The legislature saw its preference for municipal annexation as a means to ensure the "sound urban development" that is "essential to Utah's continued economic development." Utah Code Ann. § 10–2–401(1). In debate over the statute, the bill's sponsor stated that although the bill sketched a delicate compromise between cities and counties, there was no question that it

granted more benefits to cities in an effort to spur their growth and expansion. 1979 Utah Laws ch. 25, § 19 (H.B. 61, 43d Leg., Feb. 19, 1979, disk # 5, statement of Representative Farnsworth). With this perspective in mind, we address the two issues raised by the district court's ruling: first, whether land and fixtures should be included in development costs for determining compliance with the statute, and second, whether all phases of a declared multiphase project should be included in determining costs.

With respect to the first issue, the County argues that cost projections should include only the price of the building shell, exclusive of land and fixtures, because land costs will vary with the date and nature of the land purchase and fixture costs will vary from tenant to tenant. We begin with the question of land costs. In support of its argument that land costs should be excluded from cost projections, the County urges us to adopt an artificial distinction between the words "cost" and "value." Section 10–1–104 defines the $750,000 threshold in terms of "cost projections." Utah Code Ann. § 10–1–104(11). Interpreting this phrase, the County argues that including the "cost" of land will lead to arbitrary and unfair results because property owners who purchased land in different economic climates might be treated differently under the statute, even though their developments pose an identical threat to the efficient delivery of municipal services. The County rejects the alternative of including the fair market "value" of the land instead of its purchase price, arguing that if the legislature had intended land value to be part of the cost of development, it would have used the word "value" instead of "cost."

The County's distinction between the words "value" and "cost" is incorrect. In a free market system, for the purposes of determining the economic investment in a project at any given point in time, cost is value. The fact that the actual price demanded for land can change over time suggests only that we should define land value for a specific chronological point, not that we should exclude land values from the equation altogether. A fair and workable interpretation of section 10–1–104(11)'s

"cost projections" requires inclusion of the land's fair market value at the time of approval or permit.

This inclusion is desirable for three reasons. First, including land values will further the legislative intent that cities annex significant developments near their borders. As development progresses in an area, a gradual process of annexation will close unincorporated islands within cities, resulting in smoother boundaries and more efficient, cost-effective delivery of services. Because land is a significant expense in development, its location and character—both elements of its cost or value—often determine whether and to what extent the property is developed. Given that the statute regulates the magnitude and impact of the resulting developments, it is only logical that it also reach the elements that determine the developments' inception.

Second, taking into account the fair market value at the time of approval or permit will avoid the unfairness and disparity that so concern the County. Landowners who purchased their property during a time of real estate depression will not be able to evade the statute simply because of their unusually low land costs. Landowners who purchased during a time of real estate inflation will not be forced unfairly to annex simply because of their unusually high land costs. The statute will treat both landowners the same, reflecting the fact that at any given point in time, the property owner possesses only the fair market value of his or her land.

Finally, including land values will impose no onerous burden on the property owner, who by the time of approval or permit certainly will have appraised the fair market value of his or her land in order to determine whether the proposed development is a wise and feasible investment. Because it will vindicate the purpose of the statute and contribute to fairness and efficiency, we hold that fair market land values should be included in cost projections under section 10–1–104.

■ For similar reasons, we also hold that fixtures should figure into cost projections. The County argues that cost projections should encompass only the building shell, without fixtures or tenant finish, because such improvements will vary from tenant to tenant and make cost projections impossibly vague and speculative. We reject this broad limitation as contradicting the purpose of section 10–2–418 and lacking support from accepted notions of real property. As with land costs, the cost of equipping a building shell with permanent and necessary fixtures often determines whether and to what extent the development goes forward. Given that section 10–2–418 aims to give cities a voice in regulating the magnitude of development on their borders, fixtures should be included in cost projections under section 10–1–104(11).

■ The County correctly argues that including the expenses of tenant finish might make cost projections uncertain and speculative because such finishes are temporary and vary dramatically from tenant to tenant. We therefore hold that expenses of tenant finish should not figure in cost projections. However, the County errs in extending this concern to fixtures. By their very nature, fixtures, which are articles of personal property so permanently annexed to real property that they become part of the realty, do not pose the hazards of variability and transience that might undercut the integrity of the cost projections. *See* Utah Code Ann. § 70A–9–313(1)(a) (1990). Utah has long considered fixtures a part of realty, and the County provides no justification for an exception in this case. *See King Bros., Inc. v. Utah Dry Kiln Co.*, 13 Utah 2d 339, 342, 374 P.2d 254, 256 (1962).

■ Having determined that the projections should include the land's fixtures and fair market value, we turn to the second issue: how to treat multiphase, multi-unit developments in determining the application of the statute. The County urges us to apply section 10–1–104's $750,000 threshold only to discrete elements of a multiphase or multi-unit development. It characterizes the Chevron and McDonald's developments as individual and independent projects.

The outcome favored by the County would thwart the statute's purpose, as embodied in its plain language, and contradict the facts of this case. The language of section 10–1–104(11) establishes a low threshold for triggering the application of section 10–2–418. A residential subdivision of only fifteen units qualifies as urban development, as does "a commercial or industrial development for which cost projections exceed $750,000 for *any or all phases.*" Utah Code Ann. § 10–1–104(11) (emphasis added). The broad, encompassing terms "any" and "all," joined by the conjunction "or" before the word "phases," suggest an expansive legislative intent.

In the residential context, the legislature has defined urban development numerically, prohibiting County approval of subdivisions consisting of fifteen or more houses. In the commercial or business context, the legislature has defined urban development monetarily, setting the threshold at a combined sum of $750,000 for "any or all phases." In both instances, however, the statute evinces an intent to evaluate significant projects as a whole, not as unrelated and independent houses or establishments. A *group* of houses constitutes urban development, just as a *group* of commercial establishments with a combined value exceeding $750,000 triggers application of the statute. Such language gives the statute wide application, allowing municipalities to regulate significant developments near their borders.

In this case, the County has sought to avoid the purpose and plain language of the statutes by breaking development of the 4.18 acres into as many pieces as possible. Just as it has insisted that cost projections should include only the price of the building shell exclusive of land and fixtures, it has also characterized the Chevron and McDonald's developments as discrete and independent projects, disregarding the property's common owner and developers and the owner's representation to worried neighbors that he would be the developer of the entire 4.18–parcel of land, and "not piecemeal like has happened before." It has compartmentalized, redefined, and sundered the development in an effort to evade the statute.

Reading into this language a requirement that costs be computed only for discrete elements of a multi-unit development contradicts the broad phrasing of "any or all phases" and cripples the statute's purpose. We refuse to adopt such an interpretation and hold that computation of projected costs under 10–1–104(11) should include all units or phases of a multiphase or multi-unit development.

The County argues that including all phases and units of a development will make cost projections too speculative and uncertain. The facts of this case contradict the County's assertion. Given the totality of the circumstances, it was neither speculative nor uncertain that the development would exceed $750,000. At the time of rezoning, the County knew that the property's common owners and developers were planning a multiphase commercial subdivision that would attract such tenants as Chevron, McDonald's, Circle K, Minit–Lube, and Mark–10. At the time of the conditional use permit, the County knew that Chevron planned to build a service station projected to cost at least $375,000, including land. By late September, the County knew that McDonald's also intended to join the subdivision with a restaurant valued at a minimum of $300,000. And through its deputy county attorney, the County admitted that when developed, the value of the entire site would exceed $750,-000. We decline to establish the precise moment the violation occurred, but clearly, as early as its rezoning of the land, the County was aware that the value of the entire developed site would exceed $750,-000.

Because this project constituted urban development under section 10–1–104(11), section 10–2–418 required that the developers attempt to annex the property to Sandy City. The County had no authority to approve or permit urban development within one-half mile of Sandy's boundary when Sandy had declared its willingness to annex. In approving the development, the County violated section 10–2–418. Chev-

ron's conditional use permit is therefore void.

In summary, we reject the County's attempt to do piece by piece what it cannot do all at once. Masking a multi-acre, multi-unit development as an unrelated series of independent elements frustrates the legislature's expressed intent that Utah's urban development occur through sound, coherently *planned* expansion. *See, e.g.,* Utah Code Ann. §§ 10–9–20 (1986), 17–27–5 (1987), 63–28–1 (1989). Such subterfuge shifts power over local planning from public servants to private parties generally interested only in the commercial possibilities of one specific site. It also pits cities and counties against each other in a bidding war in which developers can shop among islands of unincorporated territory for the least onerous zoning and development standards while adjacent units of government prostrate themselves for developments that will enhance their tax base. The legislature enacted the comprehensive boundary and annexation provisions of the Code to end such destructive city-county conflicts. 1979 Utah Laws ch. 25, § 19 (H.B. 61, 43d Leg., Feb. 19, 1979, disk # 5, statement of Representative Farnsworth). If the present case indicates how this statute has been administered in unincorporated areas during the more than a decade since its enactment, it is high time the legislature's clear statement of public policy is properly implemented.

We reverse the court of appeals insofar as it held that the issues of annexation and urban development had been waived. We remand to the district court for further proceedings in accordance with this opinion.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.

Appendix

## LOCATION MAP

SANDY CITY BOUNDARY MAP

☐ Incorporated into Sandy City

▦ Unincorporated islands to be annexed if petitioned

▨ Unincorporated areas to be considered if petitioned

▨ Areas in dispute

■ Area at issue in this case